Garland, J.
delivered the opinion of the court.
The plaintiffs claim a tract of land lying on the Lake Pontehartrain, at the mouth of the Bayou St. John, having a front of three arpents, ten toises and two feet, with a depth of fifteen arpents, eleven toises and three inches, [225] which they say was granted to Jean Lavergne, their paternal grandfather, by Unzaga, governor of the province of Louisiana, on the 1st of August, 1771, which they allege is in possession of the defendants. The latter claim the premises under a sale made by the secretary of war in the month of August, 1831, under the provisions of an act of Congress, entitled “ an act authorizing the sale of certain military sites,” approved March 3d, 1819; by which that officer was authorized to sell such military sites belonging to the United States, as have been found, or may become useless. They allege the premises made the site of Port St. John, and were properly sold. They further plead the prescription of ten, twenty and thirty years.
The title under which the plaintiffs claim, describes the land as bounded on one side by the land of the Post of the Bayou St. John, (lindado por un costada con tierras del puesto, &c.) The witnesses describe the site of the fort as a “ mound or elevation made by the Spanish government to build a fort on,” the extent of which was not more than one hundred and twenty feet, fronting the bayou, running back seventy or eighty feet, the foundations of which are (or were a short time since) existing, and further, that “ all that belonged to the fort was within the walls.” The land in controversy, appears to be very low and subject to inundation, and other tracts belonging to individuals are contiguous. Harvey Elkins, under whom the defendants claim, took possession of the site of the fort in 1823, but by what authority is not shown.
The evidence satisfies us of the existence of Jean Lavergne, his death in I77é, and that the plaintiffs are his grandchildren, and one of the witnesses (Delassize) says he “ knew a man named Lavergne, living in the vicinity of the fort, but does not recollect his surname,” but it does not appear he was on the premises or that the plaintiffs have been since his death.
On the trial, the plaintiffs did not offer the original patent in evidence, but *139 proved there had been two extensive fires in New Orleans where then- ancestor formerly resided, that diligent search had been made for it among. [226] the papers of the family without success, and also filed their affidavit stating the loss of it, or the strong probability of its being lost. The plaintiffs then offered in evidence, a copy from a book or register of original concessions and complete grants in the office of the register of the land-office in New Orleans, which that officer certifies was taken from the records in his possession and formed a part of the archives of his office, by which the land in controversy was granted to Jean Lavergne in 1771. To the reception of this document as evidence the defendants objected:
1st. Because the absence of the original had not been sufficiently accounted for, and further that no proof had been made that the pretended grantee ever possessed the original.
2d. Because from the copy it appears the original was not signed by Governor Unzaga, nor did it bear the seal of the provincial government, which the law required all grants of the public domain should have.
3d. Because the claim of the plaintiffs, and the testimony in support of it, had never been presented to the proper officers of the United States for recognition, until a period subsequent to -the sale by the secretary of war to Harvey Elkins, under whom the defendants claim the property.
Before proceeding to the consideration of these points, we must remark, that it is not extending entire justice to the judge of the court below, to permit evidence to be submitted for his consideration, under an agreement between the parties, that objections may be subsequently taken on the appeal, to its admissibility; and we should not feel disposed to consider the exceptions filed by the defendants in this court, if it were not, that we can examine the law of the case nearly as well as if the points were presented in the regular mode. But the proper course is, to present all objections to the competency of witnesses and admissibility of evidence to the court that tries the case originally, and if it errs, it will be our duty to correct the error. [227] We are indifferent as to the form of exceptions, but require all the points raised to be submitted for decision before they are presented to us.
The latter part of the first exception seems to present itself for consideration first, because if the grantee never possessed the grant in fact or by legal intendment, it would be difficult to acoount for the absence of it, and would be a fruitless inquiry. It is here necessary to inquire whether there ever was a grant, upon which point, independent of the affidavit of the parties stating their belief of its having existed, we have had produced before us the original record of complete grants made by the Spanish governors, in charge of the proper officer of the United States, who by law is the keeper of that description of tho archives, obtained from the former sovereigns of the country, in which we find a page bearing evident marks of antiquity, and on it, registered in form, a grant to a person bearing the name of the ancestor of the plaintiffs, for a small tract of land specifying the number of arpents, toises and feet in front and depth, with boundaries well known and established, and not the least suspicion of fraud attached to it. Such evidence must go very far to prove the existence of a grant at some time. Then, was it ever in the *140 possession of the grantee ? Tho appellants contend it was not, and that delivery is tho essence of a grant. If this proposition were true in all cases, it might be conclusive in this, but we do not so understand the law. The delivery of the thing granted is an essential to the validity of the grant, but we do not consider it indispensably necessary that the evidence of title should be delivered to tho party also. If such were the case, a Very large proportion of the titles to property in this State would be invalidated. It is well known that the originals of most authentic acts never are delivered to the persons who hold the property and remain for ever in the offices of the notaries that pass them. In the case of Ma/rbv/ry v. Madison, 1 Cranch, 138, which was elaborately argued and much considered, the supreme court of the United [•228] States held that a commission is only evidence of an appointment, and that a delivery is not necessary to the validity of letters patent. It is well known that the patents for land, issued by the general government, are in most instances transmitted by the proper officer of the treasury department to the registers in the different States, for the purpose of being delivered to the proper parties. Many, of these complete grants are not delivered for years, and in some instances never. Yet it was never doubted the government was divested of all title, and the patent irrevocable, unless for fraud. If a party in all cases were held to prove that he had possessed an original title before he could give secondary evidence of it, in many cases it would work manifest injustice. It is sufficient in deriving title from the sovereign, to show the party is entitled to the evidence of the supreme will to obtain it, and if from circumstances it cannot be obtained -in the most authentic form, the ends of justice are not to be defeated by excluding the next best mode. It cannot be doubted, that if Spain now held this country, that the evidence offered would be good against the crown, and we shall hereafter show the United States are not invested with any more authority than the sovereign fr.om whom Louisiana was acquired.
If the grant never was delivered, we think the copy offered or the record itself may properly be received. It now remains to consider whether if it were delivered, the evidence of loss is not sufficient to authorize the reception of the book or copy. It is here proper to remark, that every case of- this description has to be decided on its own circumstances, and it is difficult to find precedents for all. The evidence shows us that Jean Lavergne, the grantee, died about three years after the grant. A man named Lavergne lived near the premises, if not on them. Nicholas Lavergne, the father of the plaintiffs, was a minor at the death of his father, he was the only child as it appears; it is therefore highly probable the titles and papers belonging to his [220] father’s estate went into the possession of some other person, or were deposited in some public office unknown to him. The practice of leaving title papers to lands in the possession of public officers under the Spanish government is notorious, many of which were taken from the country under the idea they were private property. It is also shown there were at least two very destructive conflagrations in New Orleans, and many public and private papers were lost or consumed. Search has been made in the land-office to ascertain if the original was there, also among the papers of the ancestor. *141 of the plaintiff, and there appears to he no place where the original can probably be found. In the absence of any motive which we can discover to suppress the original, we think enough is proved to authorize the reception of the copy, notwithstanding the grounds stated in the first exception. But it must be remembered, that we consider there is a wide difference in the cases, where the contents of a lost original are endeavored to he proved by parol, and when its loss is to he supplied by a copy taken from a record not suspicions. In the former case, we should require much stronger evidence of the loss than in the latter. 7 Peters, 77 ; 1 Starkie, 349, 354, 355 ; Roscoe on Evidence, 3, 4; 7 Mart. H. S. 550; 12 Peters, 654.
The second ground of exception goes more directly to the effect of the document offered as evidence, than to its admissibility. Having decided that secondary evidence might he admitted, we must consider it when offered, and give it the effect its weight deserves. This part of the case will he again recurred to.
This third exception is based upon the provisions of the various acts of Congress authorizing and requiring the different descriptions of claims to land derived from the Erench or Spanish governments to be presented to the officers appointed by that of the United States, for the purposes of recognition and confirmation. The object of those laws was twofold. In the first place, to ascertain the quantity of land granted and the description of the various tracts, to enable them to know what lands belonged to individuals or [230] the government, and secondly, for the purpose of confirming to the. claimants such titles as were imperfect and required further action on the part of the public authorities to complete them. A grant which was complete under the Erench or Spanish government required no confirmation to give it validity under ours. The government of Spain recognized the perfect titles derived from the Erench government which preceded it, and the treaty which ceded Louisiana to the United States expressly guarantees to all the inhabitants equal rights and privileges with other citizens, and protects and maintains them in the enjoyment of their property. Art. 3 of the Treaty of Cession; Land Laws, vol. 1, p. 43; 9 Peters, 133. If there existed a doubt upon this point, the language used by the secretary of the treasury in his instructions to the registers of the land-office at New Orleans and Opelousas, in the year 1805, would remove it. The two letters are nearly the same. He says, “ for the present I will call your attention only to one part of the law.” (Meaning the Act of Congress of March 2, 1805.) “ It is enacted by the 4th section, that persons claiming lands by virtue of legal Erench or Spanish grants, made before the 1st of October, 1800, may file a notice of their claim with the register; but that persons claiming either under the two first sections of the act, or under incomplete titles, shall do it under penalty of their claim being for ever barred. You will perceive that the distinction is drawn from the different nature of the claims; that the first species is considered as already established, and not wanting any confirmation from the government of the United States; hut it is necessary that the people should he also made to understand it; that they should know it is not intended to disturb their rights, founded on legal grants, and that the object of the first paragraph is merely *142 to enable them to have their grants recorded in an American office, if they shall think it expedient, and to prevent the possibility of the United States [231] selling through mistake, lands which have already been legally granted.” Laws, Opinions and Instructions relative to the Public Lands, part 2, p. 667, 668. It is impossible to mistake language like this, or to pervert its meaning; and it explodes the idea that Congress ever intended the forfeiture of a complete title from the former sovereigns of Louisiana, merely because it was not presented for registry.
The document in question is, we think, legal evidence, and we come now to the question of its legal effects.
There has been produced to us a book purporting to be a register of complete grants of land made by the Prench and Spanish governors in Louisiana, which book is in the keeping of the register of the land-office in the city of New Orleans, and is proved to be a part of the archives thereof. As to its authenticity we have the internal evidence which the book itself contains. History and tradition inform us, such a record was kept, and although it may not contain a complete registry of all the grants made by the Prench and Spanish governors of the province of Louisiana, we are not aware that the genuineness of any recorded in it, has been questioned. In a letter written by Morales in 1797, we find in his descriptions of the mode titles to lands were obtained, he mentions “ the book of grants,” in which he says the titles were “ noted? Land Laws, vol. 2, p. 542. In another letter written by the same person to Governor Gayoso, dated March 2, 1799, he requests “the delivery of the registers of grants.” Id. p. 550. The secretary of the treasury in his instruction to the agents of the government in the Territory of Orleans in 1805, speaks of these records and directs copies of them to be made and transmitted to him and to the registers in other land districts. Vide Laws, Opinions and Instructions relative to the Public Lands, part 2, p. 669. The act of Congress authorizing the board of commissioners to inquire into and report on land titles, mentions the evidence that “ may be found of record on the public records of such grants.” Land Laws, vol. 1, p. 521.
[232] On the register so authenticated, we find recorded a grant in the usual form of Jean Lavergne, for the land claimed, calling for specific and existing boundaries, a condition attached to it amounting to a servitude; other grants preceding and following it without any unusual space being left; the whole copied except the names of the governor and secretary at the bottom of it and the seal of office. The question is, does this give a title? Morales in one of his letters, Land Laws, vol. 2, 542, says, “ in order to obtain lands from the exchequer (fisco) the custom is still pursued, which prevailed when the Prench were masters of the country; except in 30 far as the government and the intendancy acted in concert; and no other form is or has been observed, than the presentation of a memorial by the petitioner, praying for a certain number of arpents and designating their location. In virtue of this, the surveyor or commandant of the post, with the assistance of the neighbors, makes the survey; and if no objection be offered, puts the person in possession, and gives him the papers necessary for having his title drawn out. *143 This title is issued upon, the strength of these papers, a minuté of it being preserved in the office in order that it be noted in the book of grants.”
We cannot doubt, that this title would have been a good one under the Spanish government, and wo do not believe its force and validity is impaired by the transfer of sovereignty from that government to ours. The property in the land was by it severed from the domain, and being once severed, cannot again be reannexed to it, without some proceeding declaring the severance a nullity. Under the dominion of Spain a mode was prescribed by which titles made on conditions were to be annulled, if they were not performed, but no evidence is produced of any such proceeding. It is not sufficient to deny that the regulations of O’Keilly, Gayoso, or Morales were not complied with, to put the holder of a complete grant upon proof of a performance of the conditions specified. They were not rigidly insisted on as Morales [233] tells us in the letter referred to.
It is certain that Jean Lavergne must have been in possession of the land, and that it was surveyed is made equally certain, not only from the precision with which the quantity and boundaries are stated, but that a survey and possession were indispensable to the issuing of a title in proper form. The plaintiffs therefore have a sufficient title to the. premises and must recover them, unless their rights have been lost by prescription.
The defendants hold under a regular conveyance from the secretary of war, dated in 1831, and have been in possession of the site of the Fort'St. John, since about 1823. By whatever authority Harvey Elkins took possession in the latter year is immaterial, as he only possessed the site, which was a small mound or elevation, to whioh the plaintiffs set up no claim. He does not appear to have had any transferable title to it until 1831, upon which a plea of prescription could rest, since which time ten years have not elapsed. The possession of the United States cannot avail the defendants, there being evidence on the public records that the title was in the plaintiffs before the treaty of cession.
The judgment of the district court is therefore affirmed with costs.
Bullaed, J. did not join in this decision not having heard the last argument. •