5r 457
104 606

JOHN MURDOCK *v.* JOHN GURLEY and others, Heirs of Henry H. Gurley, and the Heirs of Jacob Sides.

The Spanish Governor of the province of Louisiana, Miro, was invested with the power of granting lands within the province. The Marquis de Casa Calvo, a subsequent Governor, had no such authority, the power of disposing of the public domain having been conferred, in October, 1798, on the Intendant, but the Governor

still retained his other civil functions, and was the highest judicial officer in the province.

The Spanish provinces of Florida and Louisiana were under the jurisdiction of the Captain General of Cuba ; but the Governor of Louisiana was always recognized as having authority over the Governor of West Florida, and as having power to grant lands in that province.

APPEAL from the District Court of East Baton Rouge, *Johnson*, J.

*R. N. Ogden* and *A. N. Ogden*, for the plaintiff.

*Elam*, for the appellants.

GARLAND, J. The plaintiff claims a tract of two thousand acres of land, a large portion of which is in the possession of defendants, who also set up a title to it. The plaintiff bases his claim on a patent in favor of Thomas Hutchings, dated the 6th of April, 1776, signed by Peter Chester, the Governor of West Florida, whilst it was a British province. It describes the land as being about four miles east of the Mississippi river, near Baton Rouge, and specifies its boundaries. The grant is in the usual form, and contains several conditions, for the non-performance of which it is to be void, and the land to revert to the crown. Thomas Hutchings was, it is to be presumed, a British subject, although he is described in the evidence as being the Geographer General of the United States, at a period subsequent to the patent, under which the plaintiff claims. The evidence does not show, that he ever was a resident of West Florida, or had any actual possession of the land claimed, whilst Great Britain held that province. No evidence of a compliance with the conditions of the patent is offered ; nor does it appear that the British authorities, or those that succeeded to them, have ever taken any step to have a forfeiture declared.

On the 3d of September, 1783, a treaty was entered into between Great Britain and Spain, by which West Florida was ceded to the latter power. The 5th article of the Treaty says :— " His Catholic Majesty agrees, that the British inhabitants, or others who may have been subjects of the King of Great Britain, in the said provinces, may retire in full security and liberty, where they shall think proper, and may sell their estates, and remove their effects, as well as their persons, without being res-

trained in their *emigration* under any pretence whatever, except on account of debts, or criminal prosecutions ; the term limited for this emigration being fixed to the space of eighteen months, to be computed from the day of the exchange of the ratifications of the present treaty ; but if, from the value of the possessions of the English proprietors, they should not be able to dispose of them within the said term, then his Catholic Majesty shall grant them a prolongation proportioned to that end." On the 7th of February, in the year 1785, a prolongation of this term was granted for four months ; and on the 5th of April, 1786, another order was issued in relation to the English and American families, remaining at Baton Rouge, and other places, in which the conduct of Governor Miro, in relation to them is approved, and permission is given to them to remain where they are established, on condition, that for the present, they will take an oath of fidelity, and obedience to his Majesty, and that they will not go out of the limits of the place where they are, without an express permission to that effect. 2 White's Recopilacion, 306, 307.

Thomas Hutchings never sold the land granted to him under the provisions of the 5th article of the Treaty of 1783 ; nor does it appear, he ever took the oath of fidelity and obedience to the King of Spain, as required by the last order.

On the 2d of October, 1788, Governor Miro addressed a letter to De Grandpré the commandant at Natchez, in which he says, that he sends him a note or memorandum, which he had received from Don Diego de Gardoqui, the *Chargé d'affaires* of Spain, in the United States, in a letter, in which he recommends to the Governor, Thomas Hutchings, who seemed desirous of settling in the province of Louisiana ; and the Governor proceeds to say, that such a character will be a great acquisition. He then says, that the principal object of the recommendation is, to preserve to Hutchings the lands mentioned in the statement inclosed, among which is the land in controversy. The Governor then directs the Commandant, to make inquiry whether the lands are still vacant and if so, he says : "You will preserve them in that state, and reject any petitions for the purpose of granting them." The commands of Governor Miro were executed by the Commandant and his Surveyor, who made a report in relation to the various

tracts of land ; but little information was elicited as to the one in controversy, though De Grandpré says, he is informed it is still vacant.

On the 31st of March, 1800, Thomas Hutchings Jr. presented himself to the Marquis de Casa Calvo, then acting as the Governor of the province of Louisiana, representing, that he was the son and heir of the grantee from the British Government. That his father had died before he could execute his intention of becoming a subject of the King of Spain. He refers to the letter from Gardoqui to Governor Miro, and to the orders of the latter in relation to the lands mentioned, which include those now claimed, and the various grants made to Thomas Hutchings the elder. He then proceeds to speak particularly of a tract of land near Pointe Coupée, and another on the Comite river, and says : " which two tracts of land, I pray your Excellency to permit me to claim as my own property. I also pray, that I may be permitted to take the oath of allegiance to his Catholic Majesty, which I am ready to do ; and that I be permitted to establish myself on the said lands, with slaves and cattle, &c." He then refers to different persons to establish his good character, and the fact of his being the son of Hutchings, the grantee of the land.

Upon the petition presented to him, the Marquis de Casa Calvo, on the 1st April, 1800, ordered the oath of allegiance to be administered, and then says, that being satisfied, that Thomas Hutchings was rightfully entitled to the property he claims, as descended from his father, he directs, that he be maintained in his possession of those lands, because it is just. Wherefore, he directs Hutchings to appear before the Intendant, to complete what has been done, and adds, that he is satisfied as to his good faith and morals.

On the 20th of January, 1803, Thomas Hutchings presented a petition to Governor Salcedo, in which he represents his desire to sell the land which belonged to the estate of his father in the province, and prays, that he may have permission to do so, on such terms as may be advantageous, which permission was, on the same day, accorded by the Governor, at the foot of the petition. Whereupon, on the 5th of March, in the same year, Hutch-

ings had the land in controversy re-surveyed by Pintado, a legally authorized Spanish Surveyor, and a plat thereof made out and returned to the Commandant of the port ; and, on the 7th day of July following, by an act of sale, before De Grandpré, the Commandant of Baton Rouge, the said Hutchings sold the land to Messrs. Cochran & Rhea. By an act passed on the 24th of February, in the year 1824, Cochran & Rhea made a partition of the lands belonging to them, and the tract purchased of Hutchings became the property of Cochran, who conveyed to the father of the plaintiff, who holds it by inheritance.

Before the partition between Cochran & Rhea, the latter presented the claim to the Land Commissioners at St. Helena, for their action on it. They recommended the claim for confirmation, placing it in the first class of claims, and as being a complete grant from the British Government. The report of the Commissioners was acted on in Congress, and on the 3d of March, 1819, an act was passed, confirming all complete grants obtained from the Spanish Government, which were recommended. The act proceeds to say, that " all claims founded on British grants, contained in the said reports, which have been sold, and conveyed according to the provisions of the Treaty of Peace, between Great Britain and Spain, of the 3d of September, 1783, by which that part of Louisiana lying east of the island of Orleans, was ceded to Spain, under the denomination of West Florida, or which were settled and cultivated by the persons having the legal title therein, at the date of said treaty, are recognized as valid and complete titles, against any claim on the part of the United States, or right derived from the United States." 1 Land Laws, 758. 2 Laws, Opinions, &c., 316. Subsequent to the passing of this act, to wit, on the 1st of June, 1820, Cosby, the Register of the Land Office, and Skipwith, the Receiver of public moneys at St. Helena, gave Rhea, a certificate in the usual form, of the confirmation of the claim by the aforesaid act of Congress.

The defendants set up title to that portion of the land which is in their possession, by virtue of occupancy, settlement, and cultivation, previous to the 15th of April, 1813, by themselves, or those under whom they hold, which claims they say were confirmed by the same act of Congress, under which the plaintiff

pretends to hold ; but we do not find in the record any evidence of title at all, except their names being on the plats of survey returned into the court below.

In answer to the petition, the defendants deny generally the claims of the plaintiff. They say, that the British patent to Thomas Hutchings, cannot be the basis of a title against them, because the patentee did not comply with the provisions of the Treaty of 1783, whereby the grant was vacated, and became null and void, and the land reverted to the crown of Spain, and became a part of the public domain. They say, that the recognition of the grant by the Land Commissioners of St. Helena, adds nothing to its effect, and is negatived by the act of Congress, of March 3d, 1819. It is denied, that Thomas Hutchings, the vendor of Rhea & Cochran, was the son of the grantee.

It is also specially denied, that the letter, or order of Governor Miro, in 1788, or the proceedings of the Marquis de Casa Calvo in April, 1800, were intended to recognize the British patent, or that they amounted to a complete grant from the Spanish Government. It is further denied, that Pintado had any legal authority to make a survey, in March, 1803, wherefore no validity was given to the title of Hutchings by it, without settlement and cultivation, and his survey is averred to be null and void. The defendants also deny the validity of the sale to Cochran & Rhea, in July, 1803 ; and they further allege, that the certificate of Cosby and Skipwith, of the confirmation of the claim by the act of Congress of March 3d, 1819, was issued in error and violation of the act, as the claim was not confirmed by it, nor ever intended to be recognized, by any other act of that body. They, therefore, pray to be confirmed in their title and possession, and for a rejection of the plaintiff's claim.

In addition to the facts already stated, it is shown, on the part of the plaintiff, by the production of a plat from the British Surveyor General of West Florida, that the land granted to Hutchings, was legally surveyed on a warrant, previous to the patent's being issued ; and that the patent has been duly recorded in the Register's Office, according to the regulations established for the purpose. It is also proved, that Thomas Hutchings, the vendor of Cochran & Rhea, was recognized by the Spanish authorities

as the son of Thomas Hutchings, the grantee of the land, although by the public he was considered as his natural child. A plat of a tract of land surveyed for Duplantier, on the 7th June, 1805, by Pintado, is also produced, which shows, that it was represented as bounded by the claim of Hutchings. The counsel for the defendants has also referred us to the third volume of the State papers, relating to the public lands, (p. 53, 69,) for the purpose of showing, that on the 5th September, 1806, Pintado certified, that a part of the land covered by this claim was vacant, and that more than one hundred acres of it were granted to a person named Crane, by De Grandpré, the acting Governor at Baton Rouge, whose claim has been confirmed by the United States; but neither the certificate of confirmation, nor any title paper is given in evidence, except an entry, or notice on the plat of the Parish Surveyor, that the claim of the plaintiff covered a part of the land of Crane. We have also been referred to an abstract from the report of J. Cosby, to the Secretary of the Treasury, to show, that Brown & Dawson have been confirmed in a claim for 2000 acres of land, granted to Thomas Hutchings, which answers better to the description of the tract on the Comite river, but no title papers are exhibited.

The District Judge gave a judgment for the plaintiff, and the defendants have appealed.

From the evidence in this case we are satisfied, that the grant to Hutchings by the British Government, includes the land claimed by the defendants. The similarity in the plats of the surveys made, in 1776, by the British Surveyor, and by Pintado in March, 1803, verified by the survey ordered by the court, leaves scarcely a doubt upon the subject. The courses and distances, and natural marks are as nearly the same as two surveys can well be, made at such distant periods.

The patent from the Governor of West Florida, in 1776, it appears, was made in strict conformity to the regulations established by the King of Great Britain, in relation to the granting of lands in that province. From the provisions of the Treaty of September, 1783, between Spain and Great Britain, and the laws of the former country, and those of nations, it is very possible, that the rights of Hutchings might have been lost, but for the acts of re-

cognition, afterwards, by the Spanish authorities. From the provisions contained in the 5th article of the Treaty, it is not to be supposed, that either Spain or Great Britain intended to confer higher privileges on the non-resident subjects of the latter power, than on those who were actually in the ceded territory, which would be the case, if we should decide, that the Treaty did not operate on all alike. The lands of the actual residents, who did not sell within the time allowed by the Spanish authorities, or take the oath of allegiance, were no doubt subject to forfeiture, as the people of the ceded country could not maintain their rights to their property, without allegiance to the government, within whose jurisdiction they were nor could non-resident aliens hold lands in opposition to the will of the Sovereign, within whose jurisdiction the lands lay. It is very certain, that the Spanish authorities in Florida, considered they had a right to declare as forfeited, the lands of British subjects who had not sold in conformity to the Treaty of 1783, or taken the oath of allegiance, and we find recorded a large sale of such property made in the town of St. Augustine, in 1791, after a regular inquiry had been made into all the circumstances, and an appraisement made. 2 White's Recopilacion, p. 383, 384, 385. But the recognitions of the title of Hutchings, the British grantee, by the Spanish authorities, are so full and complete that they cannot be disregarded.

It has been stated, that in 1785, an extension of time was given to British subjects to sell their property, and that in 1786, the privilege was again held out to all those who would remain, and become Spanish subjects, of retaining the title to lands and other property. No time is fixed by this last ordinance, within which the oath of allegiance is to be taken : the Spanish authorities, therefore, had the right to enforce it when, and against whom they pleased ; and, as long as they did not exercise their power, the individual and his property remained subject to their will, or was held by sufferance. In 1788, no measures had been taken to forfeit the land of Thomas Hutchings. At that period, through the Spanish Minister in the United States, he notified the Governor of Louisiana, of his intention to become a Spanish subject. That functionary, in consideration of the services, which such a man would probably render the country, immediately issued his

edict, suspending in favor of Hutchings, the provisions of the Treaty, with a view of extending to him the benefits of the ordinance of the 5th of April, 1786. The object of all parties having been defeated by the death of the elder Hutchings, it was a very natural and reasonable course for the Marquis de Casa Calvo to pursue, to recognize the son of Hutchings, and to invest him with the rights of his father, when he offered to carry into effect the intentions of his parent.

There cannot be a doubt as to the authority of Governor Miro, to grant lands in Louisiana. If he had the power to grant, the power to recognize and ratify a grant previously made, will scarcely be questioned. That he did recognize the grants in favor of Thomas Hutchings, the evidence proves to our entire satisfaction. It is not as formal as a notarial act could have made it ; but it is as much so, as many land titles, which have been recognized by all the officers of our government. It was not necessary for him to issue a new grant to Hutchings, as his title from the British Government was complete, as soon as the penalties attached to it were released.

It has been contended, that the Marquis de Casa Calvo had no power to grant lands to any one, and, further, that he had no authority in the province of West Florida. The first proposition is, we believe, correct, as the power of disposing of the public domain had been in the month of October, 1798, vested in the Intendant ; but the Governor still retained all his other civil functions, and was, in fact, the highest judicial officer in the province. The acts performed by him seem to us more of a judicial character than any other. He recognized Thomas Hutchings, the younger, as the son and heir of the grantee of the lands from the British Government; he directed the oath of allegiance to be administered to him, and that he should be put in possession of the property descended from his ancestor. When this was done, and it became necessary for the recognized heir to sell the estate, the successor of the Marquis de Casa Calvo, authorized him to do so in the manner most advantageous to his interests. The proceedings are not so formal and complete as some of our Probate Judges would probably have made them, but they seem to contain the substance of all they would probably do in such a case. In

conformity to this order, the Commandant of the port within whose jurisdiction the land is situated, passes a sale of the land, without intimating a doubt of the validity of the power under which he acted, and it has remained unimpeached until attacked by the defendants, whose rights did not arise until some years after.

As to the authority of the Governors of Louisiana in Florida, we believe there is but little doubt. The two provinces were both under the jurisdiction of the Captain General of the Island of Cuba; but the Governor of Louisiana was always recognized as having authority over the Governor of West Florida, particularly in that part of it adjoining the Island of Orleans. There are many grants of land in that part of the State, emanating from the former Governors of Louisiana.

After the most mature deliberation, we are of opinion, that the recognition of the British title by the Spanish Government, is ample and complete, and is entitled to as much weight as if it had emanated from Governor Miro, or Carondelet. We concur in opinion with the counsel for the defendants, that the act of Congress of the 3d of March, 1819, (1 Land Laws, 758,) does not confirm the report of Cosby and Skipwith, as they seem to have supposed, so far as it relates to this claim. But we are of opinion, that the title is complete in itself; and that having been relieved by the Spanish authorities from the forfeitures pending over it, it does not need any further confirmation, than the guaranty made by the Treaty of cession, the laws of nations, and the Constitution of the United States. We think the case as strong as that of *Lavergne's Heirs* v. *Elkins' Heirs*, (17 La. 220,) and that the same principles are applicable to it.

It has been urged, that the Spanish authorities must have considered the grant to Hutchings as forfeited, as a part of the land covered by it, was subsequently granted to a person named Crane; and that Pintado, when Crane applied for a grant, certified, that the land solicited by him was vacant. The *requete* of Crane, and the certificate of Pintado, are not before us. We cannot, therefore, say to what weight they are entitled. The only evidence of Crane's claim, is found in the plat made by the Parish Surveyor, which shows a confliction between him and

Murdock v. Gurley and others.

the plaintiff. It is impossible for us to judge of the effect of the alleged grant to Crane, as it is not before us. The volume of the State Papers relating to public lands, cited by the counsel for the defendants, states that the application of Crane had been addressed to the Surveyor Kneeland, to certify whether the land was vacant or not. What he did certify, is not shown ; although it is possible he did certify the land as vacant, as it appears, that a claim in favor of Crane was afterwards recommended for confirmation.

Judgment affirmed.