# Trenier v. Stewart.

## Statutory Real Action in Nature of Ejectment.

1. *Ancient French claim of Nicholas Baudin's heirs to Mon Louis Island.*—The cession by the French government of Louisiana, in 1710-13, to Nicholas Baudin, of the land therein described as "The land of Grosse Point, to begin at and run along the course of Fowl river, till it reaches the Oysters (Oyster Pass) which separate Massacre Island from the main land," is a complete grant, conveying to the said Baudin the fee simple to the entire tract of land now known as Mon Louis Island; is protected, as a valid and complete title, by the third article of the treaty of 1803 between the United States and France; and having been recognized and confirmed by act of congress in 1829, as recommended in the report of the commissioners (5 Amer. State Papers, 130), though with a reservation in favor of the prior conflicting claims of other persons, is superior to the claim of Henry Francois, to whom, as an actual settler prior to 1819, a portion of the land was confirmed, as a donation, by act of congress in 1822, and a patent issued to his heirs in 1870, containing a similar reservation.

2. *Judicial knowledge of historical and geographical facts.*—In construing and

ascertaining the location and boundaries of an ancient French grant of lands, made more than one hundred and sixty years ago, the names of all the places and natural objects mentioned (except *Fowl* river) being now unknown, the court takes judicial notice of the general geography of the country about the mouth of that river, and also of the historical fact, stated by Bancroft and Pickett, that *Dauphin* Island was anciently called *Massacre* Island.

APPEAL from the Circuit Court of Mobile.

Tried before the Hon. H. T. TOULMIN.

This action was brought by Isabella P. Stewart and W. W. McGuire, the latter suing as the personal representative of Eleanor M. Cannon, deceased, against John Trenier, to recover the possession of a tract of land (or a four-fifths interest therein) which forms a part of Mon Louis Island; and was commenced on the 12th September, 1868. The plaintiffs derived title under an ancient French grant, or cession, to Nicholas Baudin, which was confirmed to his heirs, by act of congress, in 1829; while the defendant claimed under Henry Francois, to whom, as an actual settler prior to 1819, the land was confirmed, as a donation, by act of congress in 1822, and a patent issued to his heirs in 1870. The case was before this court, on appeal, at its June term, 1873, when the judgment of the lower court was reversed, and the cause remanded.—See the report, 49 Ala. 492-507. After the remandment of the cause, the defendant having died, the action was revived against his personal representative and heirs. The documentary evidence of title, as adduced on the second trial, was the same as on the first, which is stated at length in the former report of the case; and a repetition of it here is not necessary to an understanding of the opinion of this court, in which the additional parol testimony, or the substance of it, is also stated. The court gave the following charges to the jury:

"1. That the cession made by the French government to Nicholas Baudin, in 1710-13, was a complete grant, and vested in him a complete title to the land therein described as being on Fowl river, ten or twelve miles in length, and from two to three miles wide, and called 'Grosse Point'; and that if the jury believed, from the evidence, that 'the land of Grosse Point' and Mon Louis Island was the same land, having the same boundaries, &c., then the grant to said Baudin conveyed to him a complete title to the whole of said island, subject only to the right of eminent domain always inherent in the sovereign—said island then became his private property, the free enjoyment of which was guarantied by the treaty of cession of Louisiana in 1803, and the title to which was superior to any title subsequently acquired from the United States.

[Trenier v. Stewart.]

"2. That the grant to said Baudin being perfect and complete, the land covered by it continued to be private property, although the province which included it was successively ceded to Great Britain, to Spain, to France, and to the United States.

"3. That Baudin's title was complete at the time the United States acquired the territory; and that in the act of congress of 1822, and in the patent of 1870, the United States relinquished or conveyed to the heirs of Henry Francois only such title to said land as the government had, expressly reserving the conflicting rights of other persons; such relinquishment being made [subject?] to all just claims, whether derived from the United States, or from either British, French, or Spanish authority.

"4. That Baudin's right and title was superior to the claim of Henry Francois; and if the jury believed, from the evidence, that the land in controversy is embraced in the original French grant heretofore referred to, and that the plaintiffs derived their title to the said land from Nicholas Baudin, the grantee named in said grant, then they are entitled to recover in this action.

"5. That hearsay, and reputation among those who may be supposed to have been acquainted with the fact handed down from one to another, is competent evidence of pedigree and heirship—its sufficiency, or weight, is a matter for the jury to determine.

"6. That title to property may be acquired by virtue of adverse possession and enjoyment; but possession, to be adverse, must have been taken under color of title, and held in good faith, openly, notoriously, and continuously: that it is not necessary that the person claiming such possession should be on the land all the time—he need not live on it; but he must have actual possession of some part of it, and the possession must be open and visible, distinct and continuous—such acts of ownership as the land is capable of; and if the jury believed, from the evidence, that the plaintiffs had such possession of the land in controversy, undisturbed, for ten years before the defendants entered thereupon, then the plaintiffs are entitled to recover in this action."

"To this charge of the court, and each and every part of it, the defendants excepted;" and they now assign the same as error, together with the refusal of certain charges in writing, seventeen in number, which were requested by them, but which it is not necessary to set out.

Boyles & Overall, for appellants.—1. The French cession

to Baudin is void, because no land was severed from the public domain by survey giving it certain location, previous to the treaty between France and the United States; and the description is so vague and indefinite that this could not be done.—11 Howard, 63; 13 Howard, 266; 16 Howard, 244; 8 Wallace, 661; 17 Wallace, 414. There was no survey under the French, British, or Spanish government. "The land of Grosse Point" cannot be surveyed by metes and bounds. The first survey was made in 1831, by a deputy-surveyor, and approved by the surveyor-general in 1844. The confirmatory act, therefore, can have reference only to the face of the concession, regardless of any survey whatever made since the passage of the act of confirmation.—4 Howard, 448. A concession, having no defined boundaries, and not surveyed, cannot be considered property, and as such protected by the courts, without sanction of the political power, under the third article of the treaty of 1803.—8 Howard, 319. The concession being inchoate, and of imperfect obligation, it became an American title, and took its validity from the act of confirmation—not from any French or Spanish elements of its previous existence.—14 Wallace, 313-4. The instructions of the secretary of the treasury, in 1806, were: "No title shall be considered as complete, but legal French and Spanish grants, made and completed before the first day of October, 1800, regularly signed and issued, prior to that date, by the governor-general, or intendant of the province of Louisiana, residing at New Orleans, and duly recorded at the proper office in New Orleans."—Public Land Laws, *Opinions and Instructions*, part 2, p. 681. The concession to Baudin was not made by either of the specified officers, and all the papers relating to it were among the original archives at Mobile. Upon the cession of Louisiana, the United States succeeded to all the powers of the intendant-generals, and could, at pleasure, confirm or withhold confirmation of all imperfect titles.—8 Howard, 293.

2. The concession being inchoate, the treaty with France only imposed on the United States a political obligation to perfect it, which cannot be enforced by a judicial tribunal.—2 Howard, 375. Being unable to confirm the land to two adverse claimants, the government had to determine between the conflicting claims; and in such case, when the claim of one is confirmed, his is the better title at law.—*Ib*. When there has been a second confirmation, as in this case, the first takes the legal title, and the second must look to the justice of the government for compensation.—4 Howard, 464. The governor-general never had the power to issue a patent, though he could issue a concession, or order of survey. Such

[Trenier v. Stewart.]

claimants having never obtained a patent from the supreme government, an act of confirmation was necessary.—17 Wallace, 273. No particular time was allowed by the treaty for grantees to perfect their incomplete grants. It was left to the political department of the government; and when congress acted on the subject, the grant must be judged as it then stood.—13 Howard, 250.

3. If the concession was inchoate, the fee was in the government until a patent was issued.—11 Wallace, 442, 487; 13 Wallace, 72; 18 Wallace, 270. When a patent has been issued, it is conclusive evidence of title, in a court of law, against the United States, and against all persons claiming under the United States by junior title.—11 Wallace, 442; 13 Wallace, 72, 92; 18 Wallace, 266.

4. The concession to Baudin shows on its face that it was not intended to convey any title to the land. It was only intended to confer the right to raise cattle thereon, and with the express reservation: "Not pretending, nevertheless, to derogate in any manner from the rights and pretentions which his majesty might have thereto for the good of his service." If the intention had been to pass the fee, the donee would not have been restricted as to the use to be made of the land. In the case of private grants, if the words are of doubtful meaning, they are construed most strongly against the grantor; but the contrary rule of construction prevails in grants from the government, especially mere donations, and nothing passes by implication.—*Charles River Bridge v. Warren Bridge*, 11 Peters, 420; *United States v. Arredondo*, 6 Peters, 681; *Mills v. St. Clair County*, 8 Wallace, 581; *Perrine v. Ches. & Del. R. R. Co.*, 9 Howard, 192; 13 Howard, 81; 23 Howard, 88; 24 Howard, 448.

THOS. H. HERNDON, *contra.*—The plaintiffs' title is founded on a French grant, made in 1710, recognized by the Spanish government, while it held the sovereignty of the country, unchallenged by the British government during its dominion, and recognized and acknowledged by the government of the United States up to the present time; and upon the possession by the original grantee, and those claiming under him, for a period of more than one hundred and sixty years, uninterrupted and undisturbed, except by Francois, who, in modern nomenclature, may be appropriately termed a *squatter*. The one title springs from the sovereignty of France, and is protected by solemn treaty; the other springs from *squatter sovereignty* only. The opinion of this court, on the former appeal, decided that the concession to Baudin was a complete and perfect grant, and vested in him the title to the

VOL. LV.

[Trenier v. Stewart.]

land embraced in it ; that this title remained unaffected by the successive changes in the government of the country, being recognized by each in turn ; that it was protected by the treaty of Paris, by which the territory was ceded to the United States ; that the title never passed to the United States, and the land never became a part of the public domain ; that it required no confirmation by congress, and that it is superior and paramount to the claim shown by the defendant. The decision of this court is sustained by the following authorities : *Doe v. Eslava*, 9 Howard, 445 ; *United States v. Arredondo*, 6 Peters, 691, 724 ; *United States v. Perchman*, 7 Peters, 87 ; *Garcia v. Lee*, 12 Peters, 519 ; *United States v. Pillerin*, 13 Howard, 10 ; *Tyler v. Maguire*, 17 Wallace, 273 ; *Hall v. Root*, 19 Ala. 385 ; *Eslava v. Doe*, 7 Ala. 543 ; *New Orleans v. Armor & Cuculli*, 9 Peters, 236. No survey is necessary when the land can be identified without it.—*United States v. Hughes*, 13 Howard, 2. Grants much more uncertain and indefinite than Baudin's were held valid in the following cases : *United States v. Perchman*, 7 Peters, 54 ; *United States v. Clarke*, 8 Peters, 446 ; *United States v. Levi*, 8 Peters, 479. If there was any uncertainty, it was obviated by the subsequent possession and occupation under the grant.

MANNING, J.—This is an action at law, brought by appellees to recover four-fifths of a parcel of land on Mon Louis Island ; which island, as it is called, is a triangular tract of over 14,000 acres of land in the lower part of Mobile county, bounded east by the bay of Mobile, north-west by the narrow watercourse, or "cut-off," called Fowl river, and south by the waters of the sound which separates the mainland, of which Mon Louis Island is a part, from Dauphin Island. The plaintiffs claim title as puchasers from the heirs of Nicholas Baudin, deriving it from a French concession formerly made to him by Bienville, as lieutenant of the King, and Dartiguette, as King's counsellor, in 1710, and approved and ratified, in 1713, by La Mothe Cadillac, governor of Louisiana, officers of the highest rank and chief authority in the French settlements then recently made on the lower part of the Mississippi river, and in the vicinity of Mobile bay. Pains, it seems, were taken to have this concession presented to, and recognized by the new authorities of the colony, British, Spanish, and American, that subsequently exercised rule in the territory. It was presented to the officials of the United States, appointed to receive notice, and make registration of such claims, twice : once, to Wm. Crawford, commissioner under the acts of 1812 and 1813, and

again, in 1828, to John B. Hazard and John H. Owen, of the land-office of the United States, at St. Stephens. Plaintiffs say, that this concession, and the subsequent recognition thereof, and the confirmation of it by the second section of the act of congress of March 2d, 1829 (ch. 40. p. 358), operated to make it effectual as a grant of the entire tract of land known as Mon Louis Island. The defendants below (appelants here) deny this; and they claim the land in controversy by a title derived from the heirs of one Henry Francois, to whom, they assert, it was granted by operation of the third section of the act of congress of May 8th, 1822, by reason of said Henry's inhabitation and cultivation of it before 1819, and by a patent issued in 1870, which was founded on a land-office certificate dated in 1869. The documentary evidence of title on both sides, excepting this land-office certificate, is fully set out in the report of this case (which was here on a former occasion) in 49 Ala. Rep. 492, *et seq.*, to which report we refer. It is admitted that the proper parties are before the court; and the dispute is only in regard to the validity or operation of the grants and documentary evidence, as conveyances of the particular property in controversy.

The case now is made to differ from what it was when here before, only by evidence fuller and more complete, on the side of plaintiffs below, that the land occupied, claimed, and used by the family and descendants of Nicholas Baudin, was Mon Louis Island, and that it took its name (of course, a considerable time after the grant was made) from a son of said Nicholas, named Louis Baudin, who lived and died there over sixty years ago, and who seems to have been always called in the family, "Mon Louis," whence the name Mon Louis Island, or My Lewis' Island; while on the part of defendants below, and in order to show that the land described in the concession to Baudin as "the land of *Grosse Point*" was not on Mon Louis Island, considerable testimony was adduced, to show that there was land somewhere west of Fowl river, formerly called *Grand Point*, and sometimes, perhaps, *Gros Point*, both meaning Big Point; though it is not shown that any member of the Baudin family was ever upon it. The testimony of surveyors was also introduced, to prove that the land embraced by the concession to Baudin could not be surveyed by the description of it in that instrument, or a starting point be found for such a survey, and that its identity with Mon Louis Island could not, therefore, be established.

The following is the description in, and a part of the concession : "To Mr. Nicholas Baudin, the land of *Grosse Point*, to begin at and run along the course of Fowl river, till it

reaches the Oysters (Oyster Pass) which separate Massacre Island from the mainland, in order to raise cattle thereon. Of the said land, we have made to him, for and in the name of his majesty, the entire cession and transfer, with its circumstances and dependencies, in order that he, his children, heirs, or assigns, may enjoy and use it henceforward and forever, without being liable to be troubled and disturbed in the peaceable possession thereof." This was done in November, 1710, more than one hundred and sixty years ago. Of the names used in the description of the property, none remain to designate the objects to which they were then applied, or have passed down as such to any witness belonging to the present generation, except only that of Fowl river. This is well known as a channel, too narrow and tortuous for navigation by vessels of large size, beginning at its upper end in the west side of the bay of Mobile, and extending south of west to the waters of the sound, between the coast of the mainland and the outlying islands in the Gulf of Mexico. But there is no land in that vicinity known in our day as "*Grosse Point*," nor any pass known as "*The Oysters*," or "*Oyster Pass*," nor any island known as "Massacre Island." One of the witnesses, it is true, says that Massacre Island was west of Dauphin Island. But this testimony cannot avail much in determining what island it was that bore that name, evidently only for a short time, nearly a century before the witness was born. The most satisfactory and important evidence on the subject has been hitherto entirely overlooked.

History informs us that the name first given to Dauphin Island was "Massacre Island." It was named, probably, by Bienville himself, since his discovery on it of a large quantity of human bones was the occasion of its being called Massacre Island. He made it for a short time the headquarters of the colony that he brought to the Bay of Mobile, a few years before the date of his concession to Baudin.— See 1 Pickett's History of Ala. pp. 185 and 191 ; 3 Bancroft's History of U. S. ch. 21. A key is thus afforded for the interpretation of that document. Since Massacre Island was the land well known, almost from that time to the present, as Dauphin Island, which extends from the front of Mobile Bay westwardly as far as the mouth of Fowl river ; the waters called in the concession "The Oysters (or Oyster Pass) which separate *Massacre Island from the mainland*," are identified with the sound which extends from the mouth of Fowl river, eastwardly, into Mobile Bay ; and by bringing the river boundary down to the waters of this sound, the land it defines is also brought down to the sound, and must lie on the east side of the river, because the mainland on the

(31)

west side of it, and bounded by it, ceases far north of the pass that "separates Massacre Island from the mainland;" the only land on the west side, extending toward this pass, being some small sandy islands. We thus have a boundary for the land embraced in the concession, which begins with Fowl river at the Bay of Mobile, and, running with it south-westwardly and southwardly, reaches a tract of water that stretches back again eastwardly into the broad expanse of the same bay, which bay itself completes the boundary around the land in question. In other words, a point of the mainland, on the west side of the mouth of Mobile Bay, which point is very large (*gros*) when compared with the narrow and sharp point on the opposite mainland where Fort Morgan now stands, and is bounded on one side by Mobile Bay, and on another by the waters of the Gulf of Mexico coming in between Dauphin Island and the mainland, and forming (disregarding indentations) almost a right angle at the mouth of the bay, is cut off by the narrow channel of Fowl river, extending from one of these sheets of water to the other, to constitute "the land of *Grosse Point*," granted to Nicholas Baudin, his heirs, and assigns; a body of land which, seen correctly, as it was seen by the parties to that instrument when it was made, is the Mon Louis Island of a later and the present day. The concession granting it shows that it was executed at Fort Louis, which was then the head-quarters of the colony, and was situated a few miles north of Fowl river, at the mouth of Dog river, and on the same west side of Mobile Bay.—1 Pickett's History of Ala. Of course, the surveyors, having knowledge of the names that were afterwards changed and disappeared, and that Massacre Island was the same as Dauphin Island, would have no difficulty in surveying the land described in the concession. As surveyed in 1831, by order of the government of the United States for Alexis D. Durand, who, as the evidence shows, claimed through the grant to Baudin, it was found to contain 14,586 acres, which is near the quantity of the claim, 14,360 arpents, as presented for registration to Crawford in 1814 or 1815, and again to Hazard and Owen in 1827 or 1828. The foregoing considerations make it more certain than does even the residence, births, and deaths, of the family Baudin, on this tract, that there is no mistake in reference to its identity. By the fact of its being an island, it was separated from the public domain, and no survey was necessary for the ascertainment of it.

It would seem that an instrument so complete in itself as the concession is, so solemnly executed and ratified, so frequently produced to, and recognized by the authorities in

the colony of the several foreign states that successively acquired dominion over it; granting a body of land so distinctly separated by natural boundaries from the public domain, and so long and continuously occupied by the family and descendants of the grantee,—should certainly be considered confirmed by the treaty through which the United States acquired the country. If it is not, then there is, besides, the express confirmation of it, by section two of the act of congress of March 2d, 1829 (Ch. XL); this grant to Baudin being the subject of special report No. 2, referred to in said section,—and the land being described in the caption of the report as "Grosse Point, or l' Isle Mon Louis, estimated to contain about 14,360 arpents."

This confirmation in 1829 being "a relinquishment forever on the part of the United States, of any claim whatever" to the land known as Mon Louis Island, defined by well-known natural boundaries, is as effectual as a patent to convey all the legal title that was in the United States. No kind of title was conveyed, on the other hand, to the appellants, or those from whom they claim, prior to the date of the land-office certificate of 1869, on which the patent of 1870 was issued. There was no previous equity, as against the United States even, that gave to Francois, or his heirs, any right to the land he cultivated and inhabited. The posture of their case was this: The register and receiver reported Francois in the list of those who had inhabited and cultivated, before the year 1813, a parcel of land in the territory ceded by France to the United States, without having any claim thereto from any source; and in their reports they said: "It is believed that some of the settlers are upon lands claimed by other persons under written evidence of title; but it is impossible to particularize them, as so few maps or plats accompany the claims." The persons mentioned in this list as settlers, or heirs of settlers, were permitted to make application by having their names registered, for the lands so cultivated and inhabited; and congress, in the statute relied on (of May 8th, 1822, ch. 128, section 3), declared they should "be entitled to a grant for the lands so *claimed or settled on,* as a donation;" *provided,* the quantity to any one *should not exceed* 640 acres, and that no claim should be confirmed where the quantity was not ascertained, and report made thereon, prior to the 25th day of July, 1820. This was the mere offer of a gratuity. There being *no right* in the heirs of Francois to be confirmed, no land designated by the statute granted to him, he had no color of title, until the land-office certificate was issued to him in 1869; and such title as was conveyed by the patent issued thereupon,

was made, by the express words of that document, subject to any just claim of any other person thereto, that was derived from the United States, or from either the British, French, or Spanish authorities.

Without saying more, we concur in the conclusion reached by our predecessors when this case was here before. By the documentary evidence in it, considered in view of the historical and geographical facts of which the court must take notice, the legal title to the land in controversy is shown to be vested in the appellees. This view of the case is conclusive. All the numerous special charges to the jury, except one or two, that were asked of the circuit judge on behalf of appellants, are based on a theory of the case not consistent with the documentary evidence, and were asked with a view to have that evidence so construed by the jury as to invalidate the title it established. This was not within their province; and the charges were properly refused. They could only have confused and embarrassed the jury, instead of affording them aid to a correct verdict.

There was no error prejudicial to appellants in the rulings of the Circuit Court. Let the judgment be affirmed.