## TRENIER *v.* STEWART.

The concession of certain lands now within the State of Alabama, confirmed to Nicholas Baudin Sept. 15, 1713, by the then governor of Louisiana (*infra*, p. 798), was a complete grant to the donee, and vested in him a perfect title to them.

ERROR to the Supreme Court of the State of Alabama.

This was an action of ejectment brought by the defendants in error in the Circuit Court of Mobile County, Alabama, for the recovery of a parcel of land on Mon Louis Island, a triangular tract of over 14,000 acres of land in the lower part of that county, bounded on the east by Mobile Bay, on the northwest by Fowl River, and on the south by the waters of the sound which separates the mainland, of which Mon Louis Island is a part, from Dauphin Island.

The plaintiffs in proof of their title put in evidence an entry in American State Papers, vol. iii. pp. 19–20, being a part of the report of William Crawford, commissioner under the act of Congress of 1812 and 1813.

" Register of claims to land in the district east of Pearl River in Louisiana, derived from either the French, British, or Spanish government, which, from the circumstances, require a special report : —

" No. 1. By whom claimed : Heirs of Nicholas Baudin.

" Original claimant : Nicholas Baudin.

" Nature of claim and from what authority : French concession.

" Date of claim : 15 Sept., 1713.

" Quantity claimed : Area in arpens, about 14,360.

" Where situated : Fowl River.

" By whom issued : La Mothe Cadillac.

" Surveyed : No survey.

" Cultivation and inhabitation : Proved from 1804 to 1813."

" The claim of the heirs of Nicholas Baudin to an island in Fowl River, being ten or twelve miles in length and from two to three miles wide, is founded on the following documents : —

[Translated from the French.]

" We, lieutenants of the King, and commandant of Fort Louisiana, and Dartiquette, King's counsellor, commissary ordinary of marine, sent by the order of the court into this colony, have agreed for the good of his Majesty's service, in the advancement of this colony, to give contracts of cessions (des contrats des cessions) to several inhabitants, to wit :

" To Nicholas Baudin, the land of Grosse Pointe ; to begin at and run along the source of Fowl River till it reaches the oysters (oyster pass) which separate Massacre Island from the mainland, in order to raise cattle thereon.

" Of the said land we have made to him for and in the name of his Majesty, the entire cession, and transfer with its circumstances and dependencies, in order that he, his children, heirs, or assigns, may enjoy and use it from henceforward and for ever, without being troubled or disturbed in the peaceable possession thereof; not pretending, nevertheless, to derogate in any manner from the rights and pretensions which his Majesty might have thereto for the good of his service.

" Done at Fort Louis of Louisiana this 12th November, 1710.

" DARTIGUETTE and<br>" BIENVILLE."

Below is written : —

" We, the governor of the province of Louisiana, approve and ratify the said present concession.

" Done at Fort Louis, this 15th September, 1713.

" LA MOTHE CADALLAC."

On the margin is sealed a writing, of which the following is a copy : —

" This day, the 16th of July, in the morning, 1761, came to the office of the superior council of the province of Louisiana, Mrs. Francis Paille, widow of the deceased Nicholas Baudin, called Mingoin, an inhabitant of this town, who requested us to receive in deposite, in order to be enrolled on our minutes, the above piece and the other parts, in order that recourse may be had thereto when necessary, and copies thereof delivered to whomsoever of

right may demand them, and declared that she did not know how to write, nor sign this, according to the ordinance.   In presence of and assisted by Claude Boriteldet la Leine, her son-in-law.

"BOUTLE,

"And we, the undersigned clerk, CHATAUCOU."

And joined to the original is a small paper attached thereto by a pin, on which is written, in English:—

"Received from Mr. Moulouis two originals and two copies of land grants, 27 December, 1807.

"LUKE RUSSELL."

"I certify that the present copy is conformable to the original among the archives of the government at Mobile.   This 16 June, 1783.

"JAMES DE LA LOUSAGAE, *N. Public.*"

"The original of this, which has been presented to me, exists in the archives of government under my care.

"MOBILE, 18th June, 1783.        .        HENRIQUE GRIMAREST."

"Inhabitation and cultivation. — Thomas Powell, being sworn, saith that he knows of his own knowledge that land claimed by the representatives of Nicholas Baudin, on Fowl River, called the Island, has been inhabited and cultivated since the year 1804, and that he believes it was inhabited and cultivated before that period; that four or five acres have been cultivated.

"THOMAS POWELL."

Also the following from the fifth volume of the American State Papers, page 130, to wit:—

"*Special Report, No. 2.*

"Claim of the heirs of Nicholas Baudin to an island in Fowl River, called 'Grosse Pointe' or 'L'isle Mon Louis,' estimated to contain about 14,360 arpens.

"This claim is founded on a French concession given at Fort St. Louis, on the 12th of November, 1710, by Bienville, lieutenant of the King and commandant of Fort Louis, and by Dartiguette, commissary ordinary of the marine.

"These officers in their deed of concession state their power as emanating from the court to make grants of cession (des contrats de cessions) in the province of Louisiana; and under this authority it appears they conceded to Nicholas Baudin, the ancestor of the

present claimants, the island or tract of land called the Grosse Pointe.

" Beneath the concession is an approval and ratification of it by La Mothe Cadallac, the governor of Louisiana, signed on the 15th of September, 1713.

" It also appears from a document appended to the writing above referred to, signed by Boutru and certificate by Chantalon, clerk, that Madame Paille, widow of N. Baudin, the original grantee, presented at the office of the superior council of the province of Louisiana the aforesaid deed of concession, together with its approval and ratification, with the request that they would receive the said documents 'in deposite, in order that they might be enrolled on the minutes of the superior council, that recourse might be had there when necessary.'

" Thus far the steps taken in this concession were, as far as this board have an opportunity of ascertaining in accordance with the usage of the French government in granting lands in its provinces; nor are we aware of any regulation which restricted the authorities of that government in the quantity they might grant. Two certificates were also presented to the board, signed, first, by James de la Sampaye, notary public, dated 16th June, 1783, and, secondly, by Grimarest, Spanish commandant at Mobile, stating that the originals, the subjects of which have been recited, existed at that time in the archives of the government at Mobile. Several witnesses prove that the tract claimed has been inhabited and cultivated from a period prior to 1761 to the present time. The occupancy being uninterrupted for so long a period as is proven, first, under the French grant by which the tract was granted, and successively under the English and Spanish governments, is deemed strongly corroborative of the original grant. The claim is not incumbered by mesne conveyances, but is still in the possession of the descendants of the original grantor.

" This claim is not incumbered with mesne conveyances, but is still in the possession of the descendants of the original grantor.

" From the facts here submitted, the undersigned are of opinion that the foregoing claim is entitled to the favorable consideration of Congress.

" All which is respectfully submitted.

" JNO. B. HAZARD,

" JNO. HENRY OWEN,

*" Board of Com. for the Adjustment of Land*
*Claims in the State of Alabama.*

" ST. STEPHEN'S, Feb. 20, 1828."

The report was made by said commissioners under the authority conferred by the second section of the act of Congress approved March 3, 1827 (4 Stat. 239), and was confirmed by the act approved March 2, 1829 (id. 358), the fourth section of which is as follows : —

" That the confirmation of all the claims provided for by this act shall amount only to a relinquishment for ever, on the part of the United States, of any claim whatever to the tracts of land and town-lots so confirmed, and that nothing herein contained shall be construed to affect the claim or claims of any individual, or body politic or corporate, if any such there be."

The plaintiffs also introduced evidence tending to show that the land in the concession mentioned constitutes what is now known as Mon Louis Island; that they derived title to the land in controversy from said Nicholas Baudin, and that the defendants were in possession of it at the commencement of this suit and now.

The defendants denied this, and claimed the land under the heirs of one Henry Francois, to whom, they assert, it was granted by operation of the third section of the act of Congress of May 8, 1822, by reason of said Henry's inhabitation and cultivation of it before 1813, and by a patent from the United States issued May 5, 1870, which was founded on a land-office certificate dated in 1869.

There was a verdict for the plaintiffs, and the judgment entered thereon having been affirmed by the Supreme Court of Alabama, the defendants sued out this writ of error.

The remaining facts, and the instructions given by the court of original jurisdiction to the jury, are stated in the opinion of the court.

*Mr. Philip Phillips* and *Mr. W. Hallett Phillips* for the plaintiffs in error.

*Mr. John T. Morgan* and *Mr. Thomas H. Herndon, contra.*

MR. JUSTICE CLIFFORD delivered the opinion of the court.

Claims to land, when the province of Louisiana was ceded to the United States, were, in many instances, incomplete, arising largely from the fact that the governor of the province, during

Spanish rule, never had authority to issue a patent. Laws were accordingly passed by Congress very early after the jurisdiction was transferred, making provision for the adjustment of such inchoate claims, which in one form or another have been continued in force even to the present time.

Concessions of the kind having never received the sanction of the supreme power of the province, they did not have the effect to segregate the tract conceded from the mass of the public lands, from which it followed that when the jurisdiction of the province was transferred by the treaty the legal title to all such tracts vested in the new sovereign until confirmed.

Complete titles, of which there were a few, mostly derived during the dominion of the French, needed no confirmation, as they were fully protected by the treaty.

Sufficient appears to show that the plaintiffs derive their title from Nicholas Baudin, an old French claimant, whose title, as the plaintiffs allege, was confirmed by an act of Congress. 4 Stat. 240. They rely upon the action of the commissioners appointed under that act of Congress, and the proceedings of the commissioners shown in the State Papers, and the confirmation of the same by the subsequent act of Congress relating to the same subject-matter. Id. 358; 3 Am. State Papers, pp. 19, 20 ; 5 id. 130.

Evidence was given by both parties, as is fully set forth in the transcript and in the report of the case as prepared in the court of original jurisdiction. *Stewart* v. *Trenier*, 49 Ala. 492.

None of the other proceedings in the cause prior to the bill of exceptions and the final judgment removed here for re-examination are material in this investigation, and they are omitted, with the remark that the parties will find them all fully set forth in the statement of the reported case.

Service was made, and the defendants having appeared pleaded the general issue. Both parties gave evidence, and the verdict and judgment were in favor of the plaintiffs. Exceptions were filed by the defendants, and they appealed to the Supreme Court of the State, where the judgment was affirmed. Still dissatisfied, they sued out the present writ of error, and removed the cause into this court.

Since the cause was entered here, the defendants have as-

signed three errors, as follows: 1. That the Circuit Court erred in holding that the concession under which the plaintiffs claim is a complete title. 2. That the Circuit Court erred in holding that the title derived under that concession, accompanied by the statutory confirmation referred to, is superior to that of the defendants as confirmed by the act of Congress of an earlier date, and the patent issued to the party. 3. That the Circuit Court erred in treating the question of boundary as one to be determined by the court and jury, though the uncontradicted evidence showed that the tract could not be located by the description given in the concession.

Applicants for a concession in Louisiana as well as in California usually addressed a petition to the governor for the land, and it seldom or never appears that any survey was had before the concession was issued. Surveys frequently followed the concession or grant; and where the proceeding is regular, it affords strong evidence to support the title of the claimant.

Regular concessions or grants were usually made in one of three ways: 1. Grants by specific boundaries, where, of course, the donee is entitled to the entire tract within the described monuments. 2. Concessions or grants by quantity, as of one or more leagues of land within a larger tract described by what are called out-boundaries, where the donee is entitled to the quantity specified and no more, to be located by the public authority, usually in a manner to include the improvements of the occupant, and with due respect to any descriptive recitals in the instrument. 3. Grants or concessions of a place or rancho by some particular name, either with or without specific boundaries, where the donee is entitled to the tract known by the name specified according to the boundaries, if boundaries are given, and if not, then according to the known extent and limits of the tract or rancho as shown by the proofs, including evidence of possession and the settlement and cultivation of the occupant. *Higueras* v. *United States*, 5 Wall. 827–834.

Fee-simple title is claimed by the plaintiffs as purchasers from the heirs of the original donee to whom the concession was made, Nov. 21, 1710, by the authorized agents of the sovereign of the province as universally admitted. Full proof is also exhibited that the concession of the donee was confirmed

Sept. 15, 1713, by the governor of the province. Support to the theory that the concession is genuine and authentic is also derived from a document appended to it, showing that the widow of the donee, at a very early period, presented the same at the office of the council of the province, in order that it might be duly enrolled in the minutes of that tribunal.

Unimportant preliminary recitals in the concession will be omitted, as it is not controverted that it emanated from competent authority. It is addressed to the grantee, and purports to concede to him "the land of Grosse Pointe, to begin at and run along the course of Fowl River till it reaches the Oyster Pass which separates Massacre Island from the mainland." Enough appears to warrant the conclusion that the land was regarded as suitable for grazing, and the express declaration is that the entire cession and transfer were made in the name of his Majesty, "with its circumstances and dependencies," in order that the donee, his children, heirs, and assigns, may enjoy and use it for ever, without being troubled or disturbed in the peaceable possession thereof. 3 Am. State Papers, 20.

When the claim was first presented to the commissioners they described it as follows: The claim of the heirs of Nicholas Baudin to an island in Fowl River, being ten or twelve miles in length and from two to three miles wide, and they refer to the concession and the documents as the foundation of the claim.

Commissioners with fuller powers were subsequently appointed for the adjustment of land claims in the State where this tract is situated, and the plaintiffs gave in evidence their report upon the subject, entitled Special Report, No. 2, as follows: Claim of the heirs of Nicholas Baudin to an island in Fowl River, called Grosse Pointe, or Isle Mon Louis, estimated to contain about fourteen thousand three hundred and sixty arpens. 5 id. 130.

Extended report was made by those commissioners in favor of the claim, and it was declared valid pursuant to the first section of the act confirming the reports of the register and receiver of the land-office for the district therein described. 4 Stat. 358.

Proof of mesne conveyance to the plaintiffs was also introduced by them, and that the defendants were in possession of

the premises. Documentary evidence was also introduced by the defendants in support of their title, as heirs of Henry Francois, for which purpose they read the entries in the third volume of the State Papers relating to the claim, as contained in the report of the register of the local land-office. They then read in evidence the suplementary act of Congress providing for the confirmation of land titles in that State. 3 id. 707. Also an abstract of locations from the records of the local land-office by the register, which was made a part of the bill of exceptions, and a duplicate copy of the patent certificate, with proof that it was correctly copied from the original. Evidence was also introduced by the defendants to authenticate the record of the survey and tract which they claim, and the same was read to the jury. Oral testimony was also introduced by the defendants proving that the plat and field-notes of the survey and location were correct, and they also read in evidence the patent to them from the United States, a copy of which is attached to the transcript. Both sides examined witnesses, whose testimony is duly reported; but it is not deemed necessary to reproduce it, as it is fully reported in the transcript and in the report of the case when first tried in the court of original jurisdiction. Full report was then made of the evidence, and the same was sent up to the Supreme Court of the State.

Matters of fact are determined by the verdict of the jury; and inasmuch as the assignment of errors does not call in question any ruling of the court in admitting or excluding evidence, the re-examination of the record will be confined to the instructions of the court given to the jury, and the exceptions of the defendants to the rulings of the court in refusing the requests for instruction which they presented.

Exceptions of a general character to the entire charge of the court are not entitled to much favor, as they fail to inform the presiding justice what the matters are to which the objections apply, and frequently give rise to embarrassment in the appellate court for the same reason. Objections to the charge should be specifically pointed out before the jury retire, in order that the justice presiding may know what the supposed errors are, and have an opportunity to make any corrections that the cir-

cumstances may require, to enable the jury to determine the issue between the parties according to law and the evidence.

Six separate propositions were submitted by the court of original jurisdiction to the jury, in substance and effect as follows : —

1. That the concession under which the plaintiffs claim is a complete grant, and that it vested in the donee a perfect title to the tract therein described as being in Fowl River, ten or twelve miles in length, and from two to three miles wide, and called Grosse Pointe ; that if the jury believe from the evidence that the land of Grosse Pointe and Mon Louis Island are the same land, having the same boundaries and description, then the grant to the donee conveyed to him a complete title to the whole of the island, subject to the right of eminent domain, and that it is protected by the treaty of cession.

2. That the grant to the donee being perfect and complete, the land covered by it continued to be private property, the title to which is complete, unaffected, and unimpaired by any of the subsequent changes in the sovereignty of the province.

3. That the title of the donee was complete when the jurisdiction was ceded to the United States, which is sufficient to show that neither the act of Congress referred to nor the patent could convey any title to the other donee.

4. That the right and title of the original donee were superior to the claim of the other donee, and that if the jury believed from the evidence that the land in controversy is embraced in that concession, and that the plaintiffs derived their title to the same from that donee, then they are entitled to recover in this action.

5. That hearsay and reputation among those who may be supposed to have been acquainted with the facts as handed down from one to another is competent evidence of pedigree and heirship to be submitted to the jury, who are the judges of its weight and sufficiency.

6. That the title to real property may be acquired by virtue of adverse possession and enjoyment, when taken under color of title and held in good faith openly, notoriously, and continuously ; that if the jury believe from the evidence that the plaintiffs had such possession of the premises for ten years before

the entry of the defendants, then the plaintiffs are entitled to recover.

Exceptions were noted as having been taken to the charge of the court and to each and every part of it.   Such an exception in the Circuit Court could not be regarded as sufficient; but inasmuch as the case was reviewed and the judgment affirmed in the Supreme Court of the State, we are inclined to re-examine the errors assigned.

Suppose the matters set forth in the concession as descriptive of its location, extent, and boundaries existed there, as it must be presumed they did, when the grant was made, no one, it is supposed, would deny that they would be sufficient to give validity to the title of the plaintiffs.   Conceded or not, it must be so, as they show a compliance with two if not all of the modes in which such grants were made under the prior sovereigns of the province.

Grants made by Mexican governors, says Mr. Justice Field, were usually made in one of three ways: 1. Grants by specific boundaries, where the donee is entitled to the entire tract. 2. Grants by quantity, as of one or more leagues of land situated in a larger tract described by out-boundaries, where the donee is entitled only to the quantity specified.   3. Grants of a certain place or rancho by some particular name; which rule is well exemplified by the grant exhibited in the transcript as the grant of an island of a specified name in a particular river. *Alviso* v. *United States*, 8 Wall. 337–339.

Grant all that, and still it is insisted that the name of the tract is not remembered by the witnesses, and that such changes in the surroundings of the alleged locality have taken place that neither the locality of the concession nor its extent can be ascertained.

Two answers to that suggestion are made, both of which are entitled to great weight: 1. Whether the locality of the tract as described in the concession can be ascertained or not, presents a question of fact to be ascertained by a jury.   Evidence in respect to that issue was introduced by both parties, which was properly submitted to the jury, whose verdict is not open to revision in this court.   2. Possession under claim of right and color of title was fully proved, and was plainly of a character to

warrant the jury to find that it was adverse, uninterrupted, continuous, open, and notorious for a period twice as long as was required by the rules of the common law to bar the writ of right.

Facts found by a jury under our system of jurisprudence can only be revised in one of two ways: 1. By a motion for a new trial in the court of original jurisdiction. 2. By writ of error in some appellate tribunal for the correction of errors. *Parsons* v. *Bedford*, 3 Pet. 433, 446.

Application for a new trial was made in the court below and was refused. Since then the cause has been removed here, where nothing is open to re-examination except the question of law presented in the assignment of errors.

Separate examination of the instructions given to the jury is not required, nor could it well be accomplished without extending the opinion to an unreasonable length. Suffice it to say in that regard that they have been read with care, and that the court is of the opinion that they are correct; from which it follows that if any error has intervened it was the fault of the jury and not of the court, which cannot be remedied here, as it can only be corrected by a motion for a new trial.

Requests for instructions were made by the defendants, which were refused, and they excepted to the rulings of the court in refusing to instruct the jury as requested.

Two propositions arising out of the facts in the case cannot well be controverted: 1. That if both titles depended exclusively for their validity upon the action of Congress, the defendants' must prevail, the rule being that he who first obtains the title and not he who first applied for it has the better right. *McCabe* v. *Worthington*, 16 How. 86. 2. That if the title of the original donee was complete when the province was ceded to the United States, it is the superior title and is protected by the treaty of cession; to which a third proposition may be added, — that inasmuch as Congress has confirmed the concession to the donee as one derived from a former sovereign of the province, its genuineness and authenticity are established.

Even grant that, and still it is contended by the defendants that the land claimed was never segregated from the public domain. Proof of possession for a century and a half would

seem to be a sufficient answer to that objection, but the claim of the plaintiffs does not rest solely nor even chiefly upon that ground.  Instead of that, the evidence introduced tended strongly to show that Grosse Pointe was the appellation given to the land embraced in the island now called Mon Louis.

. Time has doubtless made some change in the topography of the place, but the description of the tract as given in the concession is as follows :· Beginning at and running along Fowl River till it reaches the Oyster Pass, which separates Massacre Island from the mainland.  From the subsequent survey it appears that Fowl River separates the island of Mon Louis from the mainland, and that the other boundaries are the bay and the gulf.

Grosse Pointe, it seems, must have referred primarily to some point of land formed by the waters of the bay and gulf, such as Cedar Point or some other of less notoriety.  Objects of the kind would naturally attract attention, and it appears that Grosse Pointe was not distant from Fowl River, which serves to explain that part of the description that describes the course after mentioning the initial point as running along the river from the Pointe to the Oyster Pass.  Beyond doubt the Oyster Pass led into the gulf, as there is no other stream than the river whose waters border upon the island.

Nothing adverse to the authenticity of the concession can be inferred from its extent, as it was customary at that day to make large grants.  Its situation as an island made it admirably adapted to the purpose of grazing, for which it was sought and conceded.  Its claimants went into possession of the tract nearly a hundred years before the province came within our jurisdiction, and on every change of the sovereign they produced their title-papers and demanded a recognition of their rights.

Fifty years after the grant, the widow of the grantee presented the title-papers to the proper officer for registry, and it appears that they were properly recorded.  Twenty years later, when another change of jurisdiction was about to be effected, another assertion of title was made, nor were they ever interrupted until the United States acquired the jurisdiction.  Their title was complete when the ratifications of the treaty of cession

were exchanged, and of course their title is protected by the treaty.

Want of survey since the treaty is suggested; but the grant was of the island whose boundaries are the waters which surround it, and which separate it as effectually from the public domain as could the most accurate official survey ever made.

Priority of recognition is claimed in favor of the other donee; but the decisive answer to that suggestion is that the act of Congress making it reserves in terms the rights of others, and limits the operation of the act to the relinquishment of any claim of the United States to the land.

Most of these views are much strengthened by historical researches of the court below, as exhibited in the opinion of the State court given in support of the judgment brought here by the present writ of error. *Trenier* v. *Stewart*, 55 Ala. 458.

Without entering further into the details of the case, it must suffice to say that we are all of the opinion that there is no error in the record.

*Judgment affirmed.*