The **CHITIMACHA TRIBE OF LOUISIANA, et al., Plaintiffs-Appellants,**

v.

**HARRY L. LAWS COMPANY, INC., et al., Defendants-Appellees.**

No. 80-3348.

United States Court of Appeals,
Fifth Circuit.

Nov. 5, 1982.

Rehearing and Rehearing En Banc
Denied Jan. 14, 1983.

---

Guy J. D'Antonio, Harry Case Stansbury, New Orleans, La., for plaintiffs-appellants.

Tunica-Biloxi Tribe and United Houma Nation, Donald Juneau, New Orleans, La., amicus curiae.

Russel J. Cremaldi, Morgan City, La., for E. J. Robicheaux, V. St. Blanc, S. B. Dinkins, H. H. Dinkins, S. Dinkins, G. Dinkins & L. Dinkins.

Patrick S. Ottinger, Lafayette, La., for Eason Oil Co.

Liskow & Lewis, Gene W. Lafitte, New Orleans, La., for Atlantic Richfield Co., Amoco Production Co. & Edgewater Oil Co.

McCloskey, Dennery, Page & Hennesy, New Orleans, La., J. William Vaudry, Jr., New Orleans, La., for Adeline Sugar Factory Co., R. Dupuy, E. Chance, B. Dupuy, Comeaux & Robert F. Giles & Fabiola M. Dupuy.

Gordon, Arata, McCollam & Watters, Sheryl L. Hopkins, New Orleans, La., for Tenneco Oil Co.

Robert C. Smith, New Orleans, La., for Amoco Production Co.

Alex P. Allain, Jeanerette, La., for Rodney J. Banta & Elizabeth Banta Lemaire.

Polack, Rosenberg, Rittenberg & Endom, Franklin V. Endom, Jr., New Orleans, La., for Michane P. Burns.

Timothy W. Cerniglia, New Orleans, La., for Texaco.

Milling, Benson, Woodward, Hillyer, Pierson & Miller, M. Hampton Carver, John C. Christian, Charles D. Marshall, New Orleans, La., for Chevron Oil Co.

Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lawrence E. Donohue, Jr., Lafayette, La., for 30 unnamed defendants.

Before CLARK, Chief Judge, and GEE and GARZA, Circuit Judges.

CLARK, Chief Judge:

The Chitimacha Tribe of Louisiana brought this suit in the Western District of Louisiana claiming ownership of a large tract of land in St. Mary Parish, Louisiana. They have named more than eighty St. Mary Parish landowners as defendants. The Chitimachas argue that three transfers of land in the eighteenth century from their ancestors to the defendants' predecessors in title were nullities, thus leaving them with full legal title. The district court, 490 F.Supp. 164, granted summary judgment in favor of the defendants. The Chitimachas argue that the trial judge erred in refusing to recuse himself from presiding over this matter. They also argue that the court incorrectly decided their title claim. We affirm.

### I. The Disqualification Issue

The Chitimachas argue that Judge W. Eugene Davis erred when he refused to recuse himself. We conclude that the judge was not disqualified from deciding this case. Before reaching the substance of the claim, however, we outline this case's complicated procedural history.

This action was commenced in July, 1977 in the Western District of Louisiana. Judge W. Eugene Davis was assigned to the case. Counsel for the Chitimachas informed Judge Davis in October, 1977, that his property might be affected by the suit and suggested that he recuse himself. The judge refused to honor this request.

In July of 1979, the Chitimachas filed the first of their amended complaints. The amendments added new defendants, made allegations of fraud, increased the amount of damages requested, and demanded a jury trial. The court immediately entered an order approving the amendments.

In August, 1979, the Chitimachas requested Judge Davis' financial disclosure statement. The request was refused. The Chitimachas moved the court to stay all proceedings pending disclosure of the financial report. The motion was denied. In November, the Chitimachas appealed the issue to this court, and moved this court and the district court to stay all proceedings pend-

ing that appeal. Both this court and the district court denied the motion.

In November, the Chitimachas requested the court for leave to amend their complaint a second time. The amendments sought, among other things, to add additional defendants to the case, and to clarify the precise boundaries of the Chitimachas' aboriginal territory. Paragraph eight of the original complaint read:

8. Since time immemorial, the plaintiff tribe has exclusively owned, used and occupied portions of the present Parish of St. Mary, Louisiana, *as part* of its aboriginal territory.

(emphasis added). Paragraph IV of their motion to amend sought to change the original complaint as follows:

8. Since time immemorial, the plaintiff Tribe has exclusively owned, used and occupied Iberia Parish, St. Mary Parish, St. Martin Parish, Iberville Parish west of the Mississippi River, Assumption Parish, and Ascension Parish west of the Mississippi River as their aboriginal territory.

The motion was set for a hearing.

On November 13, the day before a hearing, which had been scheduled months in advance, the Chitimachas filed a motion to disqualify Judge Davis pursuant to 28 U.S.C. §§ 144 and 455. They alleged that Judge Davis was interested in the outcome of the litigation because: (1) the judge owned property within the Chitimachas' aboriginal territory; (2) one of the defendants was a former client of the judge; (3) the judge's former law partners had relatives who were defendants in the action; and (4) the judge previously rendered title opinions and passed acts of sale as an attorney and notary public for various parcels of property in the contested area. A supporting affidavit signed by Leroy M. Burgess, Chairman of the Chitimacha Tribal Council, was also submitted. The Chitimachas' attorney certified that the affidavit was submitted in good faith.

Although Judge Davis commenced the scheduled hearing on November 14 as planned, the only motion he reached was the disqualification motion filed the previous day. Judge Davis initially indicated that, in his opinion, the motion was untimely:

It's absolutely inexcusable for plaintiff's counsel to have delayed filing the motion to disqualify until the day before this hearing was scheduled. This delay has caused the Court and other counsel to waste substantial time in the preparation for hearing on these complex motions.

Nevertheless, "out of an abundance of caution," Judge Davis transferred the disqualification motion to the chief judge of his district, Nauman S. Scott. Judge Davis pledged to recuse himself if Judge Scott concluded that an appearance of impropriety would result if he continued to preside over the case. Judge Davis suspended all further proceedings in the case pending resolution of the disqualification motion.

The clerk of court mailed a copy of Judge Davis' financial statement to the Chitimachas in January, 1980. Judge Scott informed the Chitimachas' attorneys that he would delay his decision on the recusal motion in order to give the Chitimachas an opportunity to amend their original motion in light of any new data revealed in the financial report. The Chitimachas never took advantage of this opportunity.

Before reaching the disqualification issue, Judge Scott passed on the Chitimachas' motion to amend their complaint. He felt compelled to rule on the motion because one of the alleged grounds for disqualifying Judge Davis was his ownership of property in Iberia Parish. One of the proposed amendments sought to add Iberia Parish to the suit as part of the Chitimachas' aboriginal territory. Iberia Parish was not mentioned in the original complaint. Judge Scott determined that the sole effect of the amendment was to furnish a gratuitous basis for disqualifying Judge Davis. He stated that the amendment did not add any substance to the Chitimachas' complaint. Judge Scott therefore refused to allow the amendment. He did not rule on the remainder of the motion to amend.

Judge Scott then proceeded to discuss the motion to disqualify Judge Davis. He ruled that the motion was not timely filed. He also analyzed each alleged ground for disqualification, and found that the affidavit was insufficient to form a basis for disqualification. He therefore concluded that there was no need for Judge Davis to recuse himself.

The Chitimachas moved Judge Scott to set aside his order and reassign the matter to yet another judge. They claimed that they had discovered grounds for disqualifying Judge Scott. Judge Scott ruled that he was not disqualified, and reaffirmed his prior order with respect to Judge Davis.[1]

Before addressing the merits of the Chitimachas' claim that Judge Davis should have recused himself, we examine first, the propriety of the procedure employed below, and second, Judge Scott's partial denial of the Chitimachas' motion to amend their complaint.

 Judge Davis' transfer of the disqualification motion to Judge Scott was somewhat irregular. Although, the practice has been permitted in the past, *see, e.g., United States v. Grinnell Corp.,* 384 U.S. 563, 582–83 n. 13, 86 S.Ct. 1698, 1709–10 n. 13, 16 L.Ed.2d 778 (1966); *Tenants & Owners in Opposition to Redevelopment v. United States Dep't of Housing & Urban Dev.,* 338 F.Supp. 29, 31 (N.D.Cal.1972), it is not to be encouraged. The challenged judge is most familiar with the alleged bias or conflict of interest. He is in the best position to protect the nonmoving parties from dilatory tactics. *See United States v. Haldeman,* 559 F.2d 31, 131 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) (submitting § 144 motions to fellow judges for decision is "at most permissive.") Referring the motion to another judge raises problems of administrative inconvenience and delay. *Parrish v. Board of Com'rs of Alabama State Bar,* 524 F.2d 98, 107 (5th Cir.) (Gee, J., specially concurring), *cert. denied,* 425 U.S. 944, 96

S.Ct. 1685, 48 L.Ed.2d 188 (1975). Although the matter is ultimately within the discretion of the challenged judge, recusal motions should only be transferred in unusual circumstances. Although such circumstances are not present in this case, it does not present error affecting substantial rights of the parties, Fed.R.Civ.P. 61, and does not involve a disregard of established procedural precedent. Thus, no reversible error is presented.

 Judge Davis also transferred the Chitimachas' motion to amend their complaint to Judge Scott. Both Judge Davis and Judge Scott apparently concluded that Judge Scott could not accurately determine whether Judge Davis should be recused without the benefit of a final decision on the motion to amend the complaint. Judge Davis owned property in Iberia Parish. The original complaint did not mention Iberia Parish. The proposed amendment did. Without the benefit of hindsight, it reasonably may have appeared that the decision on the recusal motion would directly turn on the result of the motion to amend. In addition, the judges apparently felt that it would be inappropriate for Judge Davis to decide the matter pending the décision on his disqualification. While such transfers are not to be encouraged, no reversible error is present under the circumstances of this particular case. *Cf. United States v. Martinez,* 686 F.2d 334 (5th Cir., 1982); *United States v. Stone,* 411 F.2d 597, 598 (5th Cir. 1969) (District judges may transfer cases between themselves for the expeditious administration of justice.)

Judge Scott denied leave to amend with respect to one of the Chitimachas' proposed amendments. He therefore refused to include the substance of that amendment in his consideration of the motion to disqualify. The Chitimachas argue that the district court erred in partially denying the motion. They argue that the complaint should be regarded as having been so amended for purposes of any consideration of Judge Da-

---

1. The Chitimachas have not appealed from Judge Scott's ruling on his own disqualifica-

tion.

vis' disqualification. We hold that the court properly disallowed the amendment.

■■ Rule 15(a) of the Federal Rules of Civil Procedure provides that, within specified time limits, a party may amend his pleading once as a matter of course. Otherwise, "a party may amend his pleadings only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Determining when "justice so requires" rests within the sound discretion of the trial court. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Daves v. Payless Cashways, Inc.,* 661 F.2d 1022, 1024 (5th Cir. 1981). Our function on review is limited to determining whether the trial court abused its discretion. *Jackson v. Columbus Dodge, Inc.,* 676 F.2d 120, 121 (5th Cir. 1982); *Daly v. Sprague,* 675 F.2d 716, 723 (5th Cir. 1982).

■ Rule 15(a) evinces a bias in favor of granting leave to amend. Its purpose is to assist the disposition of the case on its merits, and to prevent pleadings from becoming ends in themselves. *Dussouy v. Gulf Coast Investment Corp.,* 660 F.2d 594, 598 (5th Cir. 1981); *Summit Office Park v. United States Steel Corp.,* 639 F.2d 1278, 1284 (5th Cir. 1981); *Gregory v. Mitchell,* 634 F.2d 199, 203 (5th Cir. 1981). Although the district court should err on the side of allowing amendment, leave to amend should not be given automatically. *Addington v. Farmer's Elevator Mutual Insurance Co.,* 650 F.2d 663, 666 (5th Cir. 1981), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 672, 70 L.Ed.2d 640 (1982).

■ In exercising its discretion, the trial court should consider whether permitting the amendment would cause undue delay in the proceedings or undue prejudice to the nonmoving party, whether the movant is acting in bad faith or with a dilatory motive, or whether the movant has previously failed to cure deficiencies in his pleadings by prior amendments. The court may weigh in the movant's favor any prejudice that might arise from denial of leave to amend. In keeping with the purposes of the rule, the court should consider judicial economy and whether the amendments would lead to expeditious disposition of the merits of the litigation. Finally, the court should consider whether the amendment adds substance to the original allegations, and whether it is germane to the original case of action. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Daly v. Sprague,* 675 F.2d 716, 723 (5th Cir. 1982); *Pan-Islamic Corp. v. Exxon Corp.,* 632 F.2d 539, 546 (5th Cir. 1980), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1982); *Henderson v. United States Fid. & Guar. Co.,* 620 F.2d 530, 534 (5th Cir. 1980), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1981).

■■ One important factor in the district court's decision is the timeliness of the motion to amend. Mere passage of time need not result in a denial of leave to amend, but delay becomes fatal at some period of time. *Gregory v. Mitchell,* 634 F.2d 199, 203 (5th Cir. 1981). When there has been an apparent lack of diligence, the burden shifts to the movant to prove that the delay was due to excusable neglect. *Daves v. Payless Cashways, Inc.,* 661 F.2d 1022, 1025 (5th Cir. 1981) (liberality in pleading does not bestow on a litigant the privilege of neglecting her case for a long period of time.); *Dussouy v. Gulf Coast Investment Corp.,* 660 F.2d 594, 598 n. 2 (5th Cir. 1981).

In *Jackson v. Columbus Dodge, Inc.,* 676 F.2d 120 (5th Cir. 1982), we held that the trial court did not abuse its discretion when it refused to approve an amendment filed the day before the pretrial conference, twenty-eight months after the litigated transaction, and nineteen months after the original complaint was filed. In *Daly v. Sprague,* 675 F.2d 716 (5th Cir. 1982), the fact that the proposed amendment was not filed until sixteen months after the original complaint was filed was weighed against the movant. In *Daves v. Payless Cashways, Inc.,* 661 F.2d 1022 (5th Cir. 1981), we noted the unexplained nineteen-month delay between the filing of the original complaint and the motion for leave to amend and

concluded that the trial court did not abuse its discretion by refusing leave to amend. *See also, Rhodes v. Amarillo Hospital Dist.,* 654 F.2d 1148 (5th Cir. 1981) (amendment filed thirty months after the initial complaint and three weeks before trial denied).

■ The Chitimachas requested leave to amend two years and three months after they filed their original complaint. Because this litigation is complex and involves many parties, the fact that there was a lengthy delay is not dispositive. The factor does, however, weigh against the Chitimachas.

It was also proper to consider whether the Chitimachas would be prejudiced if denied leave to amend. Judge Scott correctly found that they would not. The amendment in question merely sought to clarify the precise boundaries of the Chitimachas' aboriginal domain. Paragraph V of the proposed amendments itself demonstrates that the Chitimachas continued to seek only to establish their title to land in St. Mary Parish:

> This is a civil action to restore the Chitimacha Tribe of Louisiana to possession of certain aboriginal territory in St. Mary Parish, Louisiana . . . .

The Chitimachas' claim to the land in St. Mary Parish depended on a finding that it was somewhere within the boundaries of their aboriginal territory. Once that finding was made the extent of the aboriginal territory was irrelevant. The proposed amendment does not add substance to the Chitimachas' cause of action. The denial of leave to amend in no way compromised the Chitimachas' chance of recovery. *See Rhodes v. Amarillo Hospital Dist., supra,* 654 F.2d at 1154 ("This is not a case in which incomplete or inadequate pleadings, uncorrected by amendment, doomed plaintiff's recovery.")[2]

The Chitimachas failed to correct pleading deficiencies when given the opportunity to do so. *See Dussouy, supra,* 660 F.2d at 598. Although The Chitimachas previously amended their complaint, they offer no justification for their failure to clearly delineate the boundaries of their aboriginal territory in those amendments. The information was available to the Chitimachas long before the first amendments were filed. It is not information that has only recently come to light.

Although not relied upon by the district court, this court noted that it is improper to amend solely to gain a tactical advantage. *Dussouy v. Gulf Coast Ins. Corp.,* 660 F.2d 594, 597 (5th Cir. 1981). Judge Scott observed:

> The sole effect of the amendment is to furnish a gratuitous basis for disqualifying Judge Davis. Even the timing of the amendment suggests that this might be its purpose. That would be judge shopping. Such an action would be devious, and complete bad faith on the part of the [Chitimachas'] attorneys . . . . We certainly imply no such purpose.

In the absence of any district court finding with respect to this factor we do not include it in our analysis.

Perhaps no one of these factors standing alone would justify a denial of leave to amend. But their combined effect demonstrates that Judge Scott did not abuse his discretion when he partially denied the Chitimachas' motion to amend.

■ The issue for determination is whether Judge Scott erred in holding that Judge Davis was not disqualified.[3] The rel-

---

**2.** This case may be analogized to a suit between two parties concerning the ownership of a certain cow. Whether that cow is part of a herd of ten cows or part of a herd of a hundred cows is irrelevant.

**3.** Disqualification questions are fully reviewable on appeal from a final judgment. *In re Corrugated Container Antitrust Litigation,* 614 F.2d 958, 960-61 (5th Cir. 1980).

The Chitimachas filed their motion to disqualify over two years after the original complaint was filed. It was submitted on the day before a motion hearing that had been scheduled months in advance. Both 28 U.S.C. §§ 144 and 455 require that a motion to disqualify be timely filed. *Delesdernier v. Porterie,* 666 F.2d 116, 121 (5th Cir. 1982) ("Lack of a timeliness requirement encourages speculation and converts the serious and laudatory business of insuring judicial fairness into a mere

evant statutes are 28 U.S.C. §§ 144 and 455.[4] Both statutes are based on the notion that a fair trial before an unbiased judge is a basic requirement of due process. *United States v. Will,* 449 U.S. 206, 101 S.Ct. 471, 481, 66 L.Ed.2d 392 (1980). "Substantively, the two statutes are quite similar, if not identical." *Delesdernier v. Porterie,* 666 F.2d 116, 120 (5th Cir. 1982) (*app. png.*) quoting *Phillips v. Joint Legislative Committee,* 637 F.2d 1014, 1019 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982). There are, however, some differences between the two.

When faced with a motion under § 144, the court focuses on the movant's affidavit. The judge must pass on the legal sufficiency of the affidavit, but not on the truth of the matters alleged. *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921); *United States v. Clark,* 605 F.2d 939, 942 (5th Cir. 1979). An affidavit is sufficient if it alleges facts that, if true, would convince a reasonable person

that bias exists. *Phillips, supra,* 637 F.2d at 1019; *United States v. Serrano,* 607 F.2d 1145, 1150 (5th Cir. 1979), *cert. denied,* 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980); *Parrish v. Board of Commissioners,* 524 F.2d 98, 100 (5th Cir. 1975) (en banc) *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

A party may also file a motion to disqualify under 28 U.S.C. § 455. *Davis v. Board of School Commissioners,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). The movant must show that, if a reasonable man knew of all the circumstances, he would harbor doubts about the judge's impartiality. *Parliament Insurance Co. v. Manson,* 676 F.2d 1069, 1075 (5th Cir. 1982); *Potashnick v. Port City Construction Co.,* 609 F.2d 1101, 1111 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). The goal of § 455 is to foster impartiality by requiring even its appearance. *United States v. Phillips,* 664 F.2d 971, 1022 (5th Cir. 1981); *Potashnick, supra,* 609 F.2d at 1111.

litigation strategy.); *Weber v. Coney,* 642 F.2d 91, 92 (5th Cir. 1981). Because, as Judge Davis put it, "nothing is more important to our system of justice than to have impartial judges presiding over trials," courts are justifiably reluctant to simply disregard an untimely claim. *United States v. Womack,* 454 F.2d 1337, 1341 (5th Cir. 1972), *cert. denied,* 414 U.S. 1025, 94 S.Ct. 450, 38 L.Ed.2d 316 (1973).

Although both Judge Davis and Judge Scott concluded that the motion to disqualify was untimely, Judge Davis went on to transfer the substance of the claim and Judge Scott went on to decide it. As did the district court, we reach the merits of the disqualification claim and conclude that Judge Davis was not disqualified from presiding over this case. We therefore also find it unnecessary to decide whether the motion to disqualify was timely filed.

4. 28 U.S.C. § 144 reads in part:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding. 28 U.S.C. § 455 reads in part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

■ A recusal motion under both statutes is committed to the sound discretion of the district judge. On appeal we ask only whether he has abused that discretion. *Weingart v. Allen & O'Hara, Inc.*, 654 F.2d 1096, 1107 (5th Cir. 1981); *United States ex rel Weinberger v. Equifax, Inc.*, 557 F.2d 456, 463 (5th Cir.), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1977). In this case, Judge Scott did not abuse his discretion in dismissing the motion to disqualify.

■ The Chitimachas allege that Judge Davis should have been disqualified because he "resides and owns immovable property within the litigation area." Judge Davis is not a named defendant because he owns no property in St. Mary Parish. He does, however, own property in Iberia Parish. By attempting to amend their complaint, the Chitimachas sought to show that Iberia Parish is within their aboriginal territory. The Chitimachas reason that all land within this territory will be "directly affected" by the outcome of the lawsuit. The problem is that they fail to show it. The St. Mary lands are the centerpiece of this litigation. They remained so under the proposed amendment. That both St. Mary and Iberia Parish lands were within the aboriginal claim may be conceded. The controlling issue still remains whether the specific ancestral grants of the St. Mary Parish lands were effective or void. We have upheld the decision of Judge Scott rejecting the amendment which attempted to add Iberia Parish to the aboriginal territory. Even if leave to amend were granted, the mere fact that Judge Davis owns some property within the expanse of the Chitimachas' former dominion does not justify his disqualification. The disposition of the Chitimachas' claim or title to land located entirely within St. Mary Parish would not affect Judge Davis' title in any way. This ownership is not a ground for disqualification.

■ The Chitimachas allege that Judge Davis formerly represented Texaco, Inc., a defendant in this action. Judge Davis was appointed to the bench six years ago. The fact that he once represented Texaco in unrelated matters does not forever prevent him from sitting in a case in which Texaco is a party. Section 455(b)(2) only requires a judge to disqualify himself if "he served as a lawyer *in the matter in controversy.*" (emphasis added). The relationship between Judge Davis and Texaco, terminated at least six years ago, is too remote and too innocuous to warrant disqualification under § 455(a) or § 144.

■ The Chitimachas also allege that Judge Davis has an ongoing investment interest in his former law firm. This allegation was not included in their affidavit. Therefore, § 455 is the only applicable section. The Chitimachas' scenario is as follows: Texaco is a defendant in this suit. Although the judge's former lawfirm occasionally represents Texaco in other matters, it does not represent Texaco or any other party in this case. Judge Davis has received periodic payments from his former lawfirm but there is no proof or suggestion that he is sharing in profits of the firm earned after his departure.[5] The Chitimachas assert that if Texaco suffers in this suit, the judge's former lawfirm might suffer indirectly. Texaco might suffer such an overwhelming financial loss that it will no

---

5. The commentary to Canon 3 of the Code of Judicial Conduct provides:

When a partner leaves a law firm to become a federal judge, he should, if possible, agree with his partners on an exact amount, which he will receive for his interest in the firm, whether the sum is to be paid within the year or over a period of years. *Advisory Opinions Nos. 24 and 56.*

Payments to a lawyer who leaves a firm to become a judge may continue to be made to the judge in accordance with any agreement provided it is clear (1) that he is not sharing in profits of the firm earned after his departure, as distinguished from his sharing in an amount representing the fair value of his interest in the firm, including the fair value of his interest in fees to be collected in the future for work done before he left the firm and (2) such judge does not participate in any case in which his former firm or any partner or associate thereof is active as counsel until the full amount which he may be entitled to receive under the agreement has been paid to him. *Advisory Opinions Nos. 24 and 56.*

longer be able to employ the judge's former firm. As a result, the firm will have less income and could be forced to cut back on the periodic payments it makes to the judge. At best, this speculation is remote and unrealistic. It does not justify disqualification.

■ The Chitimachas assert that Judge Davis should be disqualified because some defendants are related to members of his former law firms. The parties involved are not related to Judge Davis. They are not Judge Davis' former associates. They are relatives of Judge Davis' former associates. Again we find the connection to be too remote to justify recusal.

■ Finally, the Chitimachas assert that Judge Davis "has rendered title opinions and passed acts of sale as an attorney and notary public for various parcels of property in the area claimed by the Chitimachas Tribe of Louisiana as aboriginal territory and may bear professional liability as a consequence thereof . . . ." In order to be sufficient, an affidavit submitted pursuant to 28 U.S.C. § 144 must contain facts which are stated with particularity. *Phillips v. Joint Legislative Committee, supra,* 637 F.2d at 1019; *Parrish v. Board of Commissioners, supra,* 524 F.2d at 100. The Chitimachas have failed to specify what acts they are referring to. They do not specify whether the land involved is within the St. Mary Parish land area involved in this litigation. Their allegations were not stated with sufficient particularity. A court cannot adjudicate on vague, unsupported allegations of this sort.

Viewed either separately or in light of their combined effect, the Chitimachas' allegations do not withstand close analysis. The allegations contained in their § 144 affidavit, taken as true, would not convince a reasonable person that bias exists. Recusal is not justified under 28 U.S.C. § 455 because a reasonable man, had he known of all the circumstances asserted would not harbor doubts about Judge Davis' impartiality. Judge Scott correctly dismissed the Chitimachas' motion to disqualify Judge Davis.

## II. *The Merits of the Title Claim*

The Chitimachas argue that the district court erred in granting summary judgment for the defendants. They contend that the Indian Nonintercourse Act, 25 U.S.C. § 177, requires that their tribal lands be returned to them. They argue that, as Indians, they were not bound by the requirements of the Louisiana Land Claims Acts. Even if the Acts did apply, they argue that the Acts did not obligate them to file claims with the Commission established by the Act. Therefore, they argue that their title was never forfeited.

■ The Indian Nonintercourse Act did not apply to the sales involved in this cause of action. Because their title was incomplete, the Chitimachas were obligated to file their claims under the terms of the Louisiana Land Claims Acts. Their failure to do so resulted in a forfeiture of their claims. For these reasons, we uphold the district court's grant of summary judgment in favor of the defendants.

The Chitimachas were a large aboriginal group which populated a central portion of what is now the State of Louisiana. During a period of Spanish sovereignty over the region, the Chitimachas transferred the land involved in this litigation to the defendants' ancestors in title. The Chitimachas deeded one tract to Phillip Verret on September 10, 1794, another tract to Frederick Pellerin on October 1, 1794, and a third tract to Marie Joseph on June 22, 1799.

Spanish law required a colonist to obtain the express approval of the Spanish governor before purchasing any land from the Indians. *Chouteau v. Molony,* 57 U.S. (16 How.) 203, 229, 14 L.Ed. 905 (1853); *Mitchell v. United States,* 34 U.S. (9 Pet.) 711, 740, 9 L.Ed. 283 (1835). The Chitimachas do not contest the fact that the transfers were made. They argued instead that the deeds were ineffective to transfer title because they were not approved by the Spanish governor. Although defendants argue to the contrary, we will assume that the deeds were not properly approved.

In 1800, Spain relinquished the Louisiana territory to France. In 1803, the United States acquired the territory by the Louisiana Purchase. The United States found that the state of record title in its new territory was in disarray. In order to alleviate the problem, Congress passed a series of statutes collectively known as the Louisiana Land Claims Acts.[6]

The first in the series of Acts was passed in 1805. It required every individual with incomplete title to file a claim before a newly established Board of Land Commissioners. Persons with perfect or complete title were not required to file a claim, but were given the option to do so. The Board was to analyze each claim filed and report its findings to Congress. If any individual with incomplete title failed to file his claim, his right to claim title would "forever thereafter be barred."

The second Act, passed in 1807, gave the Board the power to decide all claims presented to it. The Act also extended the time for filing evidence of incomplete titles. It contained preemptive language similar to that contained in the 1805 Act:

> [B]ut the rights of such persons as shall neglect so doing [filing notice of claim] within the time limited by this act, shall, so far as they are derived from or founded on any act of Congress, ever after be barred and become void, and the evidences of their claims never after admitted as evidence in any court of law or equity whatever.

The subsequent Acts repeatedly extended the time for filing. Each Act provided that untimely claims would be void and not admitted as evidence in the courts of the United States.

The Chitimachas never filed a claim asserting rights in the land they transferred to Verret, Pellerin and Joseph. All three transferees filed their claims with the Board. All three claims were eventually confirmed. Title was not disputed until the commencement of this suit.

The Chitimachas first argue that these transfers violated the terms of the Indian Nonintercourse Act, 25 U.S.C. § 177. At the time of these transfers, that Act provided:

> That no sale of land made by any Indians or any nation or tribe of Indians within the United States, shall be valid ... unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.

Act of July 22, 1790, 1 Stat. 137.

 The Indian Nonintercourse Act did not apply to the 1794 and 1799 transfers of land from the Chitimachas to Verret, Pellerin and Joseph. These sales were not consummated "within the United States." Neither the transferor Indians nor the transferee settlers were located "within the United States." At the time these sales were made, the Louisiana territory was under Spanish dominion. As a result, Spanish, and not United States, law applied. The legislation of Congress does not extend beyond the boundaries of the United States unless a contrary legislative intent appears. *Steele v. Bulova Watch Co.,* 344 U.S. 280, 285, 73 S.Ct. 252, 255, 97 L.Ed. 252 (1952); *United States v. Mitchell,* 553 F.2d 996, 1002 (5th Cir. 1977); Restatement (Second) *Foreign Relations Law* § 38 (1965). It is quite the opposite intent that appears in this case. The 1807 act directed the Board to decide claims brought before it "according to the laws and established usages and customs of the French and Spanish governments." The "Opelousas Report," a statement of policy prepared by the Board, specifically concluded that the Indian Nonintercourse Act did not apply to sales made prior to the Louisiana Purchase. Congress confirmed and adopted the Opelousas Report by the Act of April 29, 1816, 3 Stat. 328.

---

6. Act of March 2, 1805, 2 Stat. 324; Act of April 21, 1806, 2 Stat. 391; Act of March 3, 1807, 2 Stat. 440; Act of March 10, 1812, 2 Stat. 692; Act of April 14, 1812, 2 Stat. 709; Act of February 27, 1813, 2 Stat. 807; Act of April 18, 1814, 3 Stat. 139; Act of April 29, 1816, 3 Stat. 328; Act of May 11, 1820, 3 Stat. 573; Act of May 16, 1826, 4 Stat. 168; Act of May 26, 1824, 4 Stat. 52 (extended to Louisiana by Act of June 17, 1844, 5 Stat. 676).

The Chitimachas' next argument is that the Louisiana Land Claims Acts did not apply to them. The district court concluded that the Chitimachas were bound by the provisions of the Acts. We agree.

In *Barker v. Harvey,* 181 U.S. 481, 21 S.Ct. 690, 45 L.Ed. 963 (1901) and in *United States v. Title Insurance & Trust Company,* 265 U.S. 472, 44 S.Ct. 621, 68 L.Ed. 1110 (1924), the Supreme Court interpreted the California Private Land Claims Act, Act of March 3, 1851, 9 Stat. 631. That Act was very similar to the Louisiana Land Claims Act. It created a commission to ascertain and settle title claims within the territory ceded to the United States by Mexico. All claims which were not brought before the commission within two years were forfeited. The plaintiffs in *Barker* claimed land under Mexican grants. Their claim had been properly filed and was confirmed by the Commission. Although the defendants, the Mission Indians, never presented their claim to the Commission, they asserted the right to permanently occupy the land. The plaintiffs filed suit to quiet their title against the Mission Indians' claim. The Court held that the defendant Indians were bound by the provisions of the Act. *Barker v. Harvey, supra,* 181 U.S. at 491, 21 S.Ct. at 694. "If these Indians had any claims founded on the action of the Mexican government they abandoned them by not presenting them to the commission for consideration . . . ."

In *United States v. Title Insurance & Trust Co., supra,* the United States brought suit on behalf of certain Mission Indians "to quiet in them a 'perpetual right' to occupy, use, and enjoy" a tract of land in southern California. The Indians had never filed a claim before the commission. On the other hand, the defendant's grant was confirmed pursuant to the provisions of the Act. The Court held that the Indians forfeited their claim by failing to present it to the commission.

The Chitimachas argue that the Louisiana Acts more closely resemble the statutes interpreted in *United States v. Santa Fe Pacific Railroad Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941) than those involved in *Barker.* The *Santa Fe* statutes established the office of Surveyor General of New Mexico. They authorized the Surveyor General "to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico," and required him to report his findings to Congress. Act of July 22, 1854, 10 Stat. 308; Act of July 15, 1870, 16 Stat. 291, 304. The Court expressly stated that the statutes were very different from those involved in *Barker* and *Title Insurance & Trust Co.* The statutes did not set up any system for filing and deciding the validity of the land claims. They did not contain a forfeiture provision.

As the district court put it, "the similarities of the Louisiana and California Acts are unmistakable, their differences with the Arizona and New Mexico Acts palpable." 490 F.Supp. 164, 170. *Barker* and *Title Insurance & Trust Co.* amply support the district court's conclusion that the Chitimachas were bound by the filing requirements of the Louisiana Land Claims Act.

The Louisiana Land Claims Act only required persons with "incomplete title" to file their claims. *Botiller v. Dominquez,* 130 U.S. 238, 252–54, 9 S.Ct. 525, 529–30, 32 L.Ed. 926 (1889); *Maguire v. Tyler,* 75 U.S. (8 Wall.) 650, 652, 19 L.Ed. 320 (1869); *Fremont v. United States,* 58 U.S. (17 How.) 542, 553, 15 L.Ed. 241 (1854); *United States v. Power's Heirs,* 52 U.S. (11 How.) 570, 582, 13 L.Ed. 817 (1850). Thus, this case turns on the meaning of "incomplete title." If the Chitimachas had "complete title," they were outside the scope of the Acts and were not obligated to file. If they had "incomplete title," they were required to file and their failure to do so resulted in a forfeiture.

The term "incomplete title" has been used interchangeably with "imperfect title," "equitable title" and "inchoate title." *Ainsa v. New Mexico & A. R. Co.,* 175 U.S. 76, 84, 20 S.Ct. 28, 31, 44 L.Ed. 78 (1899); *Maguire v. Tyler,* 75 U.S. (8 Wall.) 650, 661, 19 L.Ed. 320 (1869); *Smyth v. New Orleans Canal & Banking Co.,* 93 F. 899, 920–21 (5th

Cir. 1899). Incomplete title is that title which was not valid until confirmed by the United States government. *United States v. Roselius,* 56 U.S. (15 How.) 36, 38, 14 L.Ed. 590 (1853); *Smyth, supra,* 93 F. at 920; *Lavergne's Heirs v. Elkins Heirs,* 17 La. 220, 231 (1841). It is title that was not already full, legal and absolute when the territory was ceded to the United States. *Dent v. Emmerger,* 81 U.S. (14 Wall.) 308, 312, 20 L.Ed. 838 (1871); *United States v. Wiggins,* 39 U.S. (14 Pet.) 334, 349, 10 L.Ed. 481 (1880); *United States v. Percheman,* 32 U.S. (7 Pet.) 51, 86, 8 L.Ed. 604 (1833); *United States v. Arredondo,* 31 U.S. (6 Pet.) 691, 8 L.Ed. 547 (1832).

For example, incomplete title exists when the claimant produces documentary evidence of title which contains no sufficient boundaries to show that any definite and distinct parcel of land was severed from the public domain. *United States v. King,* 44 U.S. (3 How.) 773, 786, 11 L.Ed. 824 (1845); *United States v. Forbes,* 40 U.S. (15 Pet.) 173, 10 L.Ed. 701 (1841). It exists when a grantee has a proper deed, but the grantor did not have the power to transfer title. *Maguire, supra,* 75 U.S. (8 Wall.) at 657. It may exist when two grants are made of the same land. *Landes v. Brant,* 51 U.S. (10 How.) 348, 370, 13 L.Ed. 449 (1850). It exists when the only evidence of a purported grant of the Spanish governor is a notation in a notary's book. *United States v. Power's Heirs,* 52 U.S. (11 How.) 570, 571, 13 L.Ed. 817 (1850). *See also, United States v. Pillerin,* 54 U.S. (13 How.) 9, 10, 14 L.Ed. 28 (1851) (French grants made after territory ceded to Spain not confirmed by Spanish authorities).[7]

If the Chitimachas had any title at all in the Verret, Pellerin and Joseph tracts, it was incomplete, imperfect title. They executed and delivered deeds for valid consideration to the defendant's ancestors in title. They released possession of the land and allowed the settlers to hold the property. The failure to conform to the technicalities

of Spanish law in executing the transfers left the Chitimachas with incomplete title. Therefore, if they wished their land returned, they were obligated to file their claim before the Board of Land Commissioners. They did not do so. As a result, they forfeited their claims.

We hold that the Indian Nonintercourse Act did not apply to the sales involved in this case. The Chitimachas were bound by the provisions of the Louisiana Land Claims Acts. Those Acts required persons with incomplete title to file, or forfeit their claim. If the Chitimachas had any title, they had only incomplete title to the land in question. They failed to file pursuant to the provisions of the Acts. As a result, they forfeited their claims to the Verret, Pellerin and Joseph tracts. The judgment of the district court is

AFFIRMED.

---

**7.** *See generally, Trenier v. Stewart,* 101 U.S. 797, 802, 25 L.Ed. 1021 (1879); *Dent v. Emmeger,* 81 U.S. (14 Wall.) 308, 312, 20 L.Ed. 838 (1871); *United States v. McCullagh,* 54 U.S. (13 How.) 216, 217, 14 L.Ed. 118 (1851); *United States v. Wiggins,* 39 U.S. (14 Pet.) 334, 10 L.Ed. 481 (1840); *United States v. Arredondo,* 31 U.S. (6 Pet.) 691, 8 L.Ed. 547 (1832).