947 F.2d 946
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Michael J. SULLIVAN, Plaintiff-Appellant,
v.
CHESAPEAKE AND OHIO RAILWAY COMPANY, Defendant-Appellee.
 Nos. 90-1136, 90-1412.
 United States Court of Appeals, Sixth Circuit.
 Oct. 25, 1991.
 
 Before NATHANIEL R. JONES and RYAN, Circuit Judges, and BAILEY BROWN, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff Michael Sullivan seeks a new trial on damages only in this action brought under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., and the Federal Safety Appliance and Equipment Act, 45 U.S.C. § 1 et seq. The issues are whether the district court erred in:
 
 
 2
 1. Refusing to allow plaintiff to call a medical expert not listed in the final pretrial order;
 
 
 3
 2. Refusing to vacate the judgment upon grounds challenging the court's qualification to hear the case;
 
 
 4
 3. Refusing to grant a mistrial following defense counsel's reference to collateral benefits; and
 
 
 5
 4. Refusing to give plaintiff's tendered jury instructions.
 
 
 6
 We hold that the district court committed no prejudicial error or abuse of discretion warranting reversal and, therefore, affirm.
 
 I.
 
 7
 Plaintiff Michael Sullivan was a fourteen-year employee of defendant Chesapeake & Ohio Railroad, now known as CSX Transportation. On May 13, 1987, Sullivan injured his leg and knee when he attempted to open a coupling knuckle on one of defendant's rail cars. He did not return to work after the accident.
 
 
 8
 Over the next eighteen months, at CSX's request, Sullivan tried returning to work on several occasions but never worked more than two days because he would experience swelling and pain in his knee. His treating physician, Dr. Morrison, restricted him from work after each attempt to return during 1988 and 1989.
 
 
 9
 On December 10, 1987, Sullivan brought this action under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60, and the Federal Safety Appliance and Equipment Act, 45 U.S.C. §§ 1-32.
 
 
 10
 The following occurrences give rise to the several issues in this case, which we shall address seriatim.
 
 A.
 
 11
 In an effort to have current medical information at trial, CSX requested a physical examination of Sullivan within forty-five days of trial which was scheduled to begin on November 22, 1988. Because Sullivan objected, CSX obtained a court order for the examination. Dr. Wolf, who conducted the examination on October 7, 1988, concluded that Sullivan was able to return to work. Sullivan received Dr. Wolf's report on October 31, 1988.
 
 
 12
 After the final pretrial order was signed, Sullivan sought to depose Dr. Eisenman, who was not identified in the pretrial order, as an expert witness to rebut or contradict Dr. Wolf's report. CSX's motion to quash the deposition was denied by a magistrate-judge. The court, finding that Dr. Eisenman was not a necessary rebuttal witness and that it would be unfair to CSX to add another medical witness after the close of discovery, set aside the magistrate-judge's order and granted CSX's motion.
 
 B.
 
 13
 The final pretrial order was filed at the pretrial conference on November 15, 1988. This order, signed by plaintiff's counsel, included the following statement:
 
 
 14
 Plaintiff is aware that Judge Hackett's husband is an attorney who represents CSX Transportation and he waives any objections to her presiding over this case.
 
 C.
 
 15
 Prior to trial, Sullivan moved in limine to exclude any reference to Sullivan receiving railroad retirement benefits. The court took the matter under advisement, promising to reconsider the subject if "any problems" should arise during trial. During the jury voir dire, plaintiff's counsel noted that workers' compensation benefits were not available to railroad workers. During direct examination of Sullivan, his counsel asked about specific benefits Sullivan was receiving. On cross-examination of Sullivan, defense counsel asked Sullivan whether he was receiving any collateral source benefits. Plaintiff's counsel objected and the court admonished defense counsel not to pursue the matter.
 
 D.
 
 16
 At trial, Sullivan presented the testimony of economist Michael Thomson who testified concerning Sullivan's projected loss of earnings from his railroad occupation. Later, Sullivan's counsel requested the court to instruct the jury in the language of Federal Pattern Jury Instruction 85.12. The instruction references the situation in which an economist testifies. Instead, the court used 85.11, an instruction intended for use when no economist testifies.
 
 E.
 
 17
 The jury found that a violation of the Federal Safety Appliance and Equipment Act's coupler provisions caused Sullivan's injuries. The jury further found that the railroad's negligence caused his injuries, and that Sullivan was fifty percent contributorily negligent. The jury found that the gross amount of Sullivan's damages was $40,000 and the court entered judgment in that amount based upon the provisions of the Act.
 
 
 18
 After the verdict, Sullivan moved for a new trial on liability, and CSX moved for a new trial on damages. The district court denied both motions. The court also denied Sullivan's motion to vacate based on the judge's failure to sua sponte disqualify herself, pursuant to 28 U.S.C. § 455(b), due to a financial interest in the case.
 
 II.
 
 19
 Sullivan argues that $40,000 in damages is inadequate to compensate him for his loss of earnings. He seeks a new trial on damages only, contending that in light of the strong evidence in his favor, the verdict could be so low only because of the cumulative effect of the court's prejudicial errors. We now turn to those asserted errors.
 
 A.
 
 20
 Sullivan contends that it was prejudicial error for the district court to refuse to modify the pretrial order to permit the testimony of his medical expert, Dr. Eisenman, when the court allowed CSX's medical expert, Dr. Wolf, to testify as to Sullivan's current medical condition, his prognosis, pre-existing injuries, and the treating physician's surgical report. CSX responds that the court did not abuse its discretion in refusing to modify the order as Dr. Eisenman was offered after the close of discovery and rebuttal was possible through Sullivan's two treating physicians, Drs. Morrison and Dubin.
 
 
 21
 In May 1988, CSX moved for a Fed.R.Civ.P. 35 medical examination to be scheduled after discovery was closed in order to provide a current record of Sullivan's condition for trial. The court ordered this examination to occur no later than forty-five days before trial in order to accommodate Sullivan's concerns of inadequate time to rebut the findings. Dr. Wolf conducted the court-ordered examination on October 7, 1988, forty-five days before trial was scheduled to begin. Dr. Wolf prepared a report on October 10 which was received by CSX on October 12 and sent to Sullivan on October 31. A subsequent video deposition was also given by Dr. Wolf.
 
 
 22
 On November 8, the final pretrial order was due. Dr. Wolf's name was included on the witness list, but Dr. Eisenman's was not. On November 17, Dr. Eisenman examined Sullivan. On the same day, plaintiff's counsel sent defense counsel a letter identifying Dr. Eisenman as a witness to rebut or contradict Dr. Wolf.
 
 
 23
 CSX filed an emergency motion to quash the deposition of Dr. Eisenman. This motion was referred to a magistrate-judge who consulted the court's scheduling order to determine whether witnesses not identified in the pretrial order were permitted. The court's scheduling order provided that:
 
 
 24
 If, after submission of the FPTO [Final Pretrial Order], it develops that other witnesses will or may be called to testify at the trial, their names and addresses and the general subject matter of their testimony shall be reported to other counsel at the earliest possible date. (This restriction shall not apply to rebuttal witnesses, the necessity of whose testimony cannot be reasonably anticipated before trial.)
 
 
 25
 The magistrate judge found that the order allowed Sullivan "to secure rebuttal evidence regarding the examination conducted on the person of Plaintiff by Defendant's doctor in October" and thus denied CSX's motion to quash the deposition of Dr. Eisenman. The court set aside the magistrate's order and granted CSX's motion because:
 
 
 26
 Dr. Eisenman is not a necessary rebuttal witness and plaintiff is well beyond the discovery time allowed by this court. A deposition of a non-treating physician, who is not listed in the final pretrial order and who did not author a report until after the depositions of all medical witnesses who were listed in the final pretrial order, is unfair and prejudicial to defendants.
 
 
 27
 Because the trial date was postponed, the court later ordered a second medical examination by Dr. Wolf to update the court on Sullivan's condition.
 
 
 28
 The district court has broad discretion to modify or enforce a pretrial order and its rulings will be reversed on appeal only for an abuse of discretion. Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1019 (11th Cir.1982). "[T]hese orders and stipulations, freely and fairly entered into, are not to be set aside except to avoid manifest injustice." Sherman v. United States, 462 F.2d 577, 579 (5th Cir.1972) (citing Fed.R.Civ.P. 16). Amendments are permitted "where no substantial injury will be occasioned to the opposing party, the refusal to allow the amendment might result in injustice to the movant, and the inconvenience to the court is slight." Id.
 
 
 29
 No injustice to the movant occurs when the court prohibits a witness not listed on the witness list from testifying in order to contradict the opponent's testimony where the offering party knew his opponent would present evidence on the issue. Jackson, 678 F.2d at 1019. This is especially true where a movant, such as Sullivan, makes no offer of proof at trial regarding the excluded testimony. Id. As this was a FELA action involving an inability to work due to a work-related accident, Sullivan knew that his medical condition was at issue and, prior to entry of the pretrial order, he knew that CSX would offer evidence of his medical condition through the expert medical testimony of Dr. Wolf. The availability of Drs. Dubin and Morrison to contradict Dr. Wolf's findings suggests that Sullivan would suffer no injustice as a result of the court's ruling. Sullivan's complaints focus on Dr. Wolf's critique of Dr. Morrison's report, Dr. Wolf's comments on Sullivan's history, and the cause of the accident. Dr. Morrison was qualified to respond to all of those matters. Sullivan thus failed to show manifest injustice. Additionally, Sullivan failed to show that "no substantial injury [would] be occasioned to the opposing party." Sherman, 462 F.2d at 579. The court explicitly found that "[a] deposition of a non-treating physician, who is not listed in the final pretrial order and who did not author a report until after the depositions of all medical witnesses who were listed in the final pretrial order, is unfair and prejudicial to defendants." Considering the availability of other medical witnesses and the potential prejudice to CSX, the court did not abuse its discretion by refusing to allow Dr. Eisenman to testify.
 
 B.
 
 30
 Plaintiff's counsel signed a stipulation contained in the final pretrial order which stated that "plaintiff is aware that Judge Hackett's husband is an attorney who represents CSX Transportation and he waives any objections to her presiding over this case." After the verdict, plaintiff filed a motion to vacate the judgment, pursuant to 28 U.S.C. § 455(d)(4), based on his belief that the court had an impermissible "financial interest" in the case. The court denied this motion, stating that
 
 
 31
 [t]his section simply is not applicable to the trial judge in this case. Her spouse has no financial interest in the subject matter in controversy or any party to the proceedings, or any other interest that could be substantially affected by the outcome of the proceeding. The judge's spouse, an attorney, is at times retained by the defendant to represent it in specific cases and matters, as are other attorneys in the legal community. He is not in-house counsel nor is he paid a retainer. He has not participated in this matter in any way. Neither this judge nor her spouse will benefit from the outcome in this case.
 
 
 32
 A recusal motion is committed to the sound discretion of the district court. On appeal, we ask only whether the court abused its discretion. The Chitimacha Tribe of Louisiana v. Harry L. Laws Co., Inc., 690 F.2d 1157, 1162 (5th Cir.1982), cert. denied, 464 U.S. 814 (1983).
 
 
 33
 28 U.S.C. § 455(b)(4) provides that a judge shall disqualify herself when she knows that she or her spouse "has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." A " 'financial interest' means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party." 28 U.S.C. § 455(d)(4). A party may not waive section 455(b) as it is a per se rule requiring recusal in particular circumstances. Parker v. Connors Steel Co., 855 F.2d 1510, 1527 (11th Cir.1988), cert. denied, 490 U.S. 1066 (1989). Plaintiff's counsel's signature on the pretrial order thus does not preclude plaintiff from raising the recusal issue now.
 
 
 34
 Sullivan contends that the trial judge has a financial interest in this case due to her husband's prior representation of CSX in other matters, her daughter's representation of CSX on at least one occasion, and her prior affiliation with her husband's firm. To meet the burden of showing financial interest, a movant must do more than allege that "law firms are interested in as many clients as they can get, that [the judge's husband's firm] would like to keep the defendant as a client, and that if the defendant loses this lawsuit, it will take its legal business elsewhere." Diversifoods, Inc. v. Diversifoods, Inc., 595 F.Supp. 133, 139 (N.D.Ill.1984); see also Chitimacha, 690 F.2d at 1166-67. It is conceivable that a showing could be made, in a proper case, that a court's spouse may have such a material relationship to a client that it may be said that a financial interest exists.
 
 
 35
 Sullivan contends that CSX was such a material client. CSX is listed as a client in Mr. Hackett's firm's listing in Martindale Hubbell for 1987, 1988, and 1989, and four of the first five clients listed are railroads. Moreover, Mr. Hackett represented CSX in major litigation at the time this case was going to trial. Nevertheless, we think Sullivan has failed to show a sufficient financial interest to warrant reversing the district court's decision to deny the motion to vacate the judgment. We are aware of Sullivan's difficulty in trying to prove that the district court has a financial interest in this case, or in the defendant corporation, based upon Mr. Hackett's representation of CSX, without detailed disclosure from the district judge of the extent of her husband's relationship to the railroad. Sullivan had the burden of proof, however, and he could have met this burden by calling as witnesses representatives of CSX who assign CSX's legal work. He also could have called Mr. Hackett to testify as to his relationship with CSX. Sullivan failed, however, to call any witnesses regarding the relationship between Mr. Hackett and CSX. We cannot say, merely on the basis of Sullivan's argument, that this relationship constituted a material financial interest requiring the judge to recuse herself.
 
 
 36
 Sullivan further contends that the judge should have recused herself because, by his repeated representation of CSX, Mr. Hackett was an "adviser" which constitutes a financial interest under section 455(b). In making this argument, Sullivan relies on United States v. Amerine, 411 F.2d 1130 (6th Cir.1969), where the district judge in a criminal matter had been the United States Attorney during the preliminary proceedings against the defendant. This court found that recusal was necessary because the judge, when he was the United States Attorney, had been an adviser in the same case. Here, neither the district judge nor her husband had any involvement with the case and thus were not CSX advisers. Moreover, because section 455(b)(5)(ii) clearly covers the lawyer-client relation by providing that a judge must recuse herself when she "or [her] spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person ... [i]s acting as a lawyer in the proceeding," we are not convinced that the term "advisor" in section 455(4)(d) was also intended to cover this relationship. The fact that we reached a different result in Amerine may be explained by the subsequent amendment of section 455 to provide that judges formerly serving as government officials should recuse themselves from any matter that they participated in as a counselor or adviser. 28 U.S.C. § 455(b)(3). The case does not stand for the proposition that a judge must recuse herself if her spouse occasionally represents a party in other matters. We think Sullivan failed to show the existence of a formal interest under Section 455(b).
 
 
 37
 Sullivan does not raise, and therefore we do not address, whether recusal would have been required under section 455(a).
 
 C.
 
 38
 Sullivan had moved in limine to keep out any reference to railroad retirement benefits. CSX responded that it did not intend to introduce evidence of the railroad retirement plan. The court took the matter under advisement and told CSX that "[s]hould something be introduced in plaintiff's case that makes you believe it would be appropriate to address that, I'll revisit this."
 
 
 39
 On direct examination, Sullivan's counsel elicited the following testimony from Sullivan:
 
 
 40
 Q.: Okay. Now, Mr. Sullivan, you've received medical care and treatment. Who's paid the medical bills?
 
 
 41
 A.: Travelers Insurance Company.
 
 
 42
 Q.: And that's your--your employee fringe benefits insurance company?
 
 
 43
 A.: Right.
 
 
 44
 Q.: I just want it clear, you didn't pay for it?
 
 
 45
 A.: No.
 
 
 46
 Q.: While you've been off and not working, Mr. Sullivan, have you received any salary, wages or money from the railroad?
 
 
 47
 A.: No. The railroad hasn't given me any money at all since I've been off.
 
 
 48
 Q.: But just so the jury is clear, the occasions that you did return to work, you got paid for those?
 
 
 49
 A.: Oh, yes, the days I worked I got paid for.
 
 
 50
 Defense counsel, believing that plaintiff had opened the door by suggesting the absence of collateral source benefits, asked the following questions:
 
 
 51
 Q.: Now, Mr. Thompson asked you on direct that your medicals were paid for by Travelers, which is through your employer, and you're not claiming any medicals, correct?
 
 
 52
 A.: No. Travelers insurance has paid for everything.
 
 
 53
 Q.: And that's been through your employer?
 
 
 54
 A.: Yes.
 
 
 55
 Q.: And, then he said you weren't paid any wages by the railroad during this period of time?
 
 
 56
 A.: Other than the days I went back to work. I was paid for those days.
 
 
 57
 Q.: You're not telling this jury you didn't get any other types of benefits during that time, are you?
 
 
 58
 Plaintiff's counsel objected and the last question remained unanswered. At a bench conference, defense counsel argued that he was allowed to ask about collateral source benefits as plaintiff's counsel had opened the door by asking about benefits during direct examination and by his references to workers' compensation benefits during voir dire. The court ruled that because the "jury knows he's not out there with no income," the attorney should "[l]eave it alone." Plaintiff's counsel asked for, and was denied, a mistrial based on defense counsel's question about collateral source benefits.
 
 
 59
 Evidence of collateral source benefits is not admissible in FELA actions because such evidence "is readily subject to misuse by a jury." Eichel v. New York Cent. R.R. Co., 375 U.S. 253, 255 (1963). "However, when the plaintiff makes specific reference to collateral source payments on direct examination, the scope of permissible inquiry is set by the direct examination and the usual rules on cross-examination apply." Lange v. Missouri Pac. R.R. Co., 703 F.2d 322, 324 (8th Cir.1983). The "usual rules on cross-examination" provide that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." Lange, 703 F.2d at 324 (citing Fed.R.Evid. 611(b)). In Lange, evidence that the plaintiff had received workers' compensation benefits was admissible to test the plaintiff's credibility when the plaintiff had testified on direct examination that he returned to work immediately after his surgery because he had to support his family and had no savings to fall back on. Id. Likewise, the court in Gladden v. P. Henderson & Co., 385 F.2d 480, 483-84 (3rd Cir.1967), cert. denied, 390 U.S. 1013 (1968), ruled that
 
 
 60
 plaintiff on direct examination brought into the case an additional, affirmative element by testifying that he had returned to work and had not visited Dr. Krause again because he had fallen behind in the payment of his bills and wanted to catch up on them and support his family. Defendant was not required to leave this testimony unchallenged and had the right to ask plaintiff on cross-examination whether he had received financial assistance, as affecting the credibility of his assertion. To have forbidden such cross-examination would have conferred on plaintiff the unparalleled right to give testimony on direct examination with immunity from inquiry on cross-examination.... [T]he collateral benefit rule cannot be made a springboard from which a plaintiff may go forward with affirmative evidence that he returned to work while he was still ailing, because of financial need and then seek immunity from cross-examination regarding it. The boundary of silence was crossed when plaintiff affirmatively presented on direct examination the reason why he had returned to work after seven weeks and had not again visited his physician. The trial court therefore was justified in opening the door for cross-examination for the narrow purpose of testing the credibility of plaintiff's assertion.
 
 
 61
 The court explicitly distinguished its case from Eichel where "the plaintiff had not affirmatively testified in such a manner as to warrant any effort at contradiction by cross-examination. Instead, defendant there attempted to introduce prejudicial evidence of disability pension payments simply because it was logically relevant on the extent and duration of the plaintiff's disability." Id. at 483. Collateral source benefits, then, may be a proper subject of cross-examination when the plaintiff's direct testimony erroneously states that he is not receiving any financial assistance.
 
 
 62
 CSX also contends that the door was opened by plaintiff's counsel mentioning workers' compensation during voir dire. In another FELA action where counsel argued that FELA was the plaintiff's only possible remedy as he was ineligible for workers' compensation, the court commented that "ineligibility for workers' compensation benefits was completely irrelevant to the issues presented in this case, and allowing the jury to consider such information could have prejudiced the Railroad." Stillman v. Norfolk & W. Ry. Co., 811 F.2d 834, 838 (4th Cir.1987). As the court explained, "defendants in FELA cases are not permitted to inform the jury that a plaintiff has received benefits from a collateral source. We perceive no reason for a different rule when the plaintiff in a FELA case seeks to inform the jury of the absence of benefits from a collateral source." Id. (citations omitted). Plaintiff's counsel in this case likewise should not have informed the jury that FELA has different rules about workers' compensation and that the jury should listen carefully to the judge's instructions.
 
 
 63
 Plaintiff's counsel asked on direct examination whether the plaintiff had "received any salary, wages or money from the railroad." The plaintiff denied that he had received any money from the employer. Counsel also asked whether plaintiff's hospital bills were covered by his employer's insurance and implied that workers' compensation would not be available. These questions and comments arguably opened the door to inquiry about benefits. The court did not err in refusing to grant a new trial based on defense counsel's questions about collateral benefits.
 
 D.
 
 64
 Plaintiff's counsel argues that the court erred by instructing the jury in the language of Federal Pattern Jury Instruction 85.11 instead of pattern instruction 85.12 as requested. Appellate courts accord district judges broad discretion in formulating jury charges as long as the instruction accurately reflects the law and facts. United States v. Heffington, 682 F.2d 1075 (5th Cir.1982), cert. denied sub. nom., Giella v. United States, 459 U.S. 1108 (1983). In reviewing the instructions, an appeals court must look at the charge in its entirety. United States v. Smith, 584 F.2d 759 (6th Cir.1978), cert. denied, 441 U.S. 922 (1979).
 
 
 65
 The instructions in dispute involve the concept of the present worth of loss of future earnings. Sullivan contends that the court should have given instruction 85.12 entitled "Alternative Instruction--Lost Wages and/or Earning Capacity--When Economic Experts Testify," as economist Michael Thomson had testified. The court instead gave instruction 85.11, "Damages--Present Worth of Future Loss." Both instructions tell the jury to reduce future loss to present worth. They differ in that 85.11 specifically tells the jury how to make this calculation and 85.12 instructs the jury that they may discount based on the economic principles discussed by the experts.
 
 
 66
 Sullivan does not contend that instruction 85.11 as given misstated the law or facts, only that he believes, in light of the expert testimony, that 85.12 was more appropriate. Instruction 85.12 and 85.11 both instruct as to reducing damages for future loss to present worth and are substantively similar. Laying aside the probability that neither instruction is entirely comprehensible to the average juror, we do not believe that the district court abused its broad discretion in utilizing 85.11 rather than 85.12.
 
 III.
 
 67
 We conclude that the district court committed no error warranting reversal and did not abuse its discretion in refusing to vacate the judgment upon the recusal issue. Therefore, we AFFIRM.